UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 19-CV-81292-Ruiz/Reinhart

DOLORES CALICCHIO,

           Plaintiff,

v.

OASIS OUTSOURCING GROUP HOLDINGS, L.P., et al.,

           Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 97) AND MOTION TO
STRIKE (ECF NO. 113)**

In her Second Amended Complaint (SAC) (ECF No. 57), Plaintiff Dolores Calicchio alleges claims under the Equal Pay Act ("EPA") (29 U.S.C. § 206(d)) and Title VII of the Civil Rights Act ("Title VII") (42 U.S.C. § 2000e et seq.) against the seven Defendants: Oasis Outsourcing Group Holdings, L.P., Oasis Outsourcing Holdings Inc., Oasis Outsourcing Group Holdings, GP, LLC, Oasis Outsourcing Acquisition Corp., WRI II, Inc. (collectively referred to as "Oasis"), as well as Paychex, Inc. and Paychex North America, Inc. (jointly referred to as "Paychex"). The SAC contains eleven counts, namely, a claim for EPA violations against each of the seven Defendants (Counts I-VII), and Title VII claims for gender discrimination and retaliation against Defendants Oasis Outsourcing Group Holdings, L.P. and Paychex North America, Inc. (Counts XIII-XI).

Presently before the Court are the Defendants' Motion for Summary Judgment (ECF No. 97) and Motion to Strike the Declaration of Vilma Petrovsky (ECF No. 113). Both motions were referred to me by the Honorable Rodolfo A. Ruiz, II for appropriate disposition.  ECF No. 116.  In addition to the SAC and the motions, I have reviewed Ms. Calicchio's responses (ECF No. 102, 118), Defendants' replies (ECF No. 111, 121), and the parties' competing Statements of Material Facts ("SOF") (ECF No. 96, 101, 122), with corresponding exhibits.

For the reasons explained below, I RECOMMEND that Defendants' motion to strike the Petrovsky declaration be GRANTED and Defendants' motion for summary judgment be GRANTED IN PART AND DENIED IN PART.

## UNDISPUTED MATERIAL FACTS[1]

### History of Oasis

1.      Founded in 1996, Oasis is a Professional Employer Organization (PEO) that provides outsourced services (payroll, benefits, and human resources responsibilities) to client companies.  *See* Defendants' Statement of Facts ("DSOF") ¶ 1 (ECF No. 96).

2.      In 2003, Mark Perlberg joined Oasis as its Chief Executive Officer (CEO). DSOF ¶ 3.

3.      By 2016, Oasis was the largest privately-held PEO in the United States, with offices in 16 states and over 8,400 clients.  DSOF ¶ 6.  The private equity strategy

---

[1]   Defendants' Reply SOF attempts to revisit their initial SOF and offer new evidence to rebut Plaintiff's contention that some of those facts are in dispute.  ECF No. 122 at 2-5. Local Rule 56.1(b)(3) states that in a reply SOF, the movant shall respond to the non-movant's additional facts; the rule does not provide an opportunity for the movant to bolster their initial SOF with additional evidence.  Accordingly, I will disregard Defendants' Reply SOF ¶¶ 1-55.

generally involves enhancing the value of the owned company, with the eventual objective of selling the company in an acquisition.  DSOF ¶ 5.

4.     In December 2018, Oasis was acquired by Paychex North America Inc. (owned by Paychex Inc.), a company providing similar services, in a transaction valued at approximately $1.2 billion.  DSOF ¶ 7.

## Incentive Common Unit (ICU) Awards

5.     Private equity funds issue Incentive Common Units (ICUs), subject to specific vesting requirements or other restrictions, which permit holders of the ICUs to receive a portion of the sale proceeds if the private equity asset is sold.  DSOF ¶ 15.

6.     Oasis issued ICUs as part of its compensation package offer to new candidates for management positions.  DSOF ¶ 16.  ICU offers were made to incentivize the management team to maximize performance and the value of Oasis in the event it was acquired by a private equity holder.  The value of the ICUs as compensation would be realized when there was an acquisition.  DSOF ¶ 17.

7.     There was a pool of ICU awards that could be assigned to Oasis employees, which comprised 30,000 units at the outset of 2018; nothing prohibited Oasis from issuing ICUs from that pool to Ms. Calicchio in 2017 or 2018.  *See* Plaintiff Calicchio's Statement of Facts ("PSOF") (ECF No. 101) ¶ 148.

8.     In September 2018, Plaintiff Dolores Calicchio first became aware that the four men she has identified as her comparators at Oasis (Terry Mayotte, Kelley Castell, Michael Viola, and Joel Steigelfest) had received larger ICU awards than she did. PSOF ¶ 134.

**Ms. Calicchio is Hired by Oasis**

9.      Ms. Calicchio interviewed for the Executive Vice President of Human Resources position at Oasis in 2016.  At the time, Ms. Calicchio had more than 15 years of experience as a human resources executive and was the Vice President of Human Resources for Noven Pharmaceuticals, Inc., a Miami-based pharmaceutical company.  DSOF ¶ 28; PSOF ¶ 115.

10.      Oasis worked with a search firm to fill the Executive Vice President of Human Resources job.  The search firm identified candidates with base salaries in the $300,000 to $330,000 range, and total compensation packages of $400,000 to $500,000, which was higher than what Mr. Perlberg, the CEO, wanted the compensation range for the position to be.  DSOF ¶ 24.

11.      Ms. Calicchio's compensation at Noven Pharmaceuticals totaled approximately $360,000 to $370,000 annually, which consisted of a base salary of approximately $260,000 to $270,000 and a bonus structure of about 40% (i.e., approximately $100,000).  DSOF ¶ 29.

12.      Ms. Calicchio also had certain "long term incentive entitlements" with Noven Pharmaceuticals valued at $340,000 annually, bringing her total compensation package there to approximately $700,000 per year, but she was not yet vested in those long-term incentives when she left Noven.  *See* Calicchio Dep. Tr. 160:7-161:14, 162:5-8, 167:7-24 (ECF No. 93-1).

13.      Oasis had no policies governing how compensation would be set.  PSOF ¶ 104. Mr. Perlberg had responsibility for determining compensation offers to candidates for

executive positions and Ms. Calicchio negotiated the terms of her compensation with him.  DSOF ¶¶ 9, 30.

14.    During the negotiation period when Ms. Calicchio was trying to decide whether to leave Noven and join Oasis, Mr. Perlberg told her that she would "be very happy with [her] offer because it was very similar to the COO's," and that their compensation would be "on par," with "almost equal" salaries.  PSOF ¶ 68; *see also* Calicchio Dep. Tr. 119:3-10.

15.    Ms. Calicchio was "not thrilled" with Mr. Perlberg's first salary offer and asked if he could raise the salary (requesting an amount that was the same base salary she was receiving at Noven), but Mr. Perlberg indicated that he could not increase the salary offer without deducting from the bonus potential.  DSOF ¶ 31.

16.    Ultimately, Mr. Perlberg offered Ms. Calicchio approximately $360,100 in annual salary and bonus potential, which she accepted.  PSOF ¶ 175 (citing Offer Letter (ECF No. 92-4)).

17.    Mr. Perlberg told Jacqueline Schwarting, the Director of Talent Acquisition at Oasis, that Ms. Calicchio wanted "to make sure that her salary is in line with the other executives" at Oasis, but not bonuses or ICU's.  PSOF ¶ 69.

18.    Mr. Perlberg led Ms. Calicchio to believe that the number of ICU's she was granted was non-negotiable.  PSOF ¶ 133.

19.    Ms. Calicchio was hired by Oasis as the Executive Vice President of Human Resources effective January 4, 2017.  DSOF ¶ 24.  At some point, she asked for and

was given the title of Chief Human Resources Officer (CHRO).  *See* Calicchio Dep. Tr. 37:10-22; Perlberg Dep. Tr. 120:2 (ECF No. 93-3).

20.    Ms. Calicchio testified that she probably would not have accepted the position at Oasis because of the smaller bonus, however, she was motivated to accept the offer because Oasis' office was located significantly closer to her Wellington, Florida home than her Noven office in Miami.   To avoid the onerous commute to Noven, Ms. Calicchio had purchased a condominium in Miami where she lived during the week. The job at Oasis would enable her to live full-time with her family in Wellington. DSOF ¶ 33.

21.    As the CHRO at Oasis, Ms. Calicchio's primary duties included: spearheading all human resources processes and practices to align with business growth; implementing new training for improved sales and operations performance; managing human resources strategy development and executing initiatives aligned to business objectives; developing new employee engagement programs; improving leadership talent pipeline for sales offices growth and expansion; creating new process for performance management, compensation strategy and execution; managing process and design for reorganizing workforce and growth initiatives to prepare for the company's sale/acquisition; leading acquisition integration efforts for employee systems, processes and policy; designing a regional model strategy to enhance customer service and retention; assessing talent to fill internal and external roles; attending and presenting at quarterly board meetings; executive coaching;

recruiting and training; and managing payroll for Oasis employees nationwide, which was the company's single biggest cost. DSOF ¶ 34; PSOF ¶¶ 34, 113.

22. Ms. Calicchio had nine employees who reported directly to her. PSOF ¶ 118.

23. None of the people Ms. Calicchio supervised were Executive Vice Presidents or Senior Vice Presidents. DSOF ¶ 35.

24. Ms. Calicchio was the only woman reporting directly to Mr. Perlberg in 2017 and 2018. PSOF ¶ 111.

25. None of Mr. Perlberg's decisions regarding Ms. Calicchio's compensation were due to perceived poor performance. PSOF ¶ 107.

**Ms. Calicchio's Comparators**

26. Kelley Castell was hired as the first (and ultimately only) Chief Operating Officer (COO) of Oasis effective September 19, 2016. DSOF ¶ 20.

27. Mr. Perlberg agreed to compensate Mr. Castell so as to make him "whole" with respect to the compensation he would be forfeiting by leaving his then-current employer and coming to Oasis, which included a guaranteed bonus. PSOF ¶¶ 70, 109.

28. As COO, Mr. Castell was the highest-ranking executive responsible for the day-to-day operation of Oasis and the delivery of its services to its clients; he also had ultimate responsibility for sales, marketing, operations, client service and information technology. DSOF ¶ 21.

29. Mr. Castell supervised eight management officials who reported directly to him, including the Chief Sales Officer, Chief Marketing Officer, Chief Information Officer, and four Senior Vice Presidents. *See* Castell Decl. (ECF No. 93-10) ¶ 4.

30.     Terry Mayotte was a co-founder of Oasis and served as an Executive Vice President and the company's Chief Financial Officer (CFO). DSOF ¶¶ 2, 26. He was responsible for preparation of financial reports, summaries and forecasts of business and business growth, income statements, balance sheets, reports to private equity owners, tax returns and related materials, and interaction with the Board of Directors and other owners of the private equity managers of Oasis. *Id.*

31.     Mr. Mayotte supervised management officials responsible for financially-related aspects of Oasis' services, including the Controller of Oasis, its Director of Tax, its Senior Director of Compliance and Integration, its Senior Vice President of Benefits, its Senior Director of Procurement, its Senior Director of Business Analytics and Reporting, and its Senior Director of Risk and Safety Services. DSOF ¶ 27.

32.     Ms. Calicchio, Mr. Castell, Mr. Mayotte, and Mr. Perlberg formed Oasis' Steering Committee. PSOF ¶¶ 90-92, 97.

33.     Michael Viola was Oasis' Chief Sales Officer; he was responsible for driving external sales to clients; he had one or two employees who reported directly to him. PSOF ¶¶ 170, 171, 173.

34.     Joel Steigelfest was the Chief Information Officer at Oasis and was the highest-ranking employee overseeing the Information Technology portion of the business nationwide. He was responsible for overhauling the company's outdated technology with new software. He had three employees who reported directly to him. PSOF ¶¶ 167, 168.

**Paychex's Acquisition of Oasis**

35.     In the summer of 2018, Mr. Perlberg advised his executive team that Oasis might be acquired by Paychex and that the acquisition could result in the elimination of certain roles, specifically identifying Ms. Calicchio's CHRO role as one of them. DSOF ¶ 37.

36.     Beginning in August 2018, as the process leading to Paychex's acquisition of Oasis proceeded, Paychex began determining which Oasis employees would be offered positions when the two organizations merged, and which would not.  DSOF ¶ 38.

37.     In September of 2018, John Gibson (Senior Vice President of Service for Paychex) and Laurie Zaucha (Vice President of Human Resources and Organizational Development for Paychex) met with Mr. Perlberg to obtain his input and feedback on the members of the Oasis Senior Leadership Team.  DSOF ¶ 39.

38.     In this September 2018 meeting, Mr. Perlberg described Ms. Calicchio as a competent HR professional, but indicated that Paychex did not need to retain her because the position she held at Oasis was already filled at Paychex by Laurie Zaucha.  DSOF ¶¶ 40, 42.

39.     In the same meeting, Mr. Perlberg also indicated that neither COO Kelley Castell nor Michael Viola (Oasis' Chief Sales Officer) needed to be retained by Paychex.  DSOF ¶ 41.

40.     In November or December of 2018, Mr. Perlberg asked Laurie Zaucha "whether Ms. Calicchio might conceivably be retained" by Paychex, but Ms. Zaucha responded, "that would not be the case."  *See* Perlberg Dep. Tr. 139:14-140:1 (ECF No. 109-1).

41.     Paychex's acquisition of Oasis closed in December 2018.  DSOF ¶ 44.

42.     Mr. Castell was released in March 2019 as a result of the acquisition, because there was a duplication of his Oasis position with Paychex.  DSOF ¶ 43.

43.     On January 4, 2019, Mr. Perlberg met with Ms. Calicchio and told her that if she did not secure another position with Paychex, her employment would end on March 31, 2019.  DSOF ¶ 47; PSOF ¶¶ 47, 48, 178.  *See also* Calicchio Declaration (ECF No. 100-1) ¶ 14.

44.     Sometime between the end of January and the middle of February 2019, Mr. Perlberg told Ms. Calicchio that her end-date had been extended to May 31, 2019, but, as explained in Mr. Perlberg's February 12, 2019 follow-up letter, that date was "an approximation and [was] subject to change at any time."  DSOF ¶¶ 47, 48; PSOF ¶¶ 179, 180.  *See also* Perlberg Letter dated February 12, 2019 (ECF No. 100-1 at 12).

**Ms. Calicchio's Complaint of Unequal Pay**

45.     Ms. Calicchio first raised the "pay equity issue" with Mr. Perlberg during their January 4, 2019 meeting when he notified her of her end-date.  See Calicchio Dep. Tr. 134:6-14, 135:7-11.[2]

---

[2]   I reject Ms. Calicchio's attempt to create a disputed issue of fact regarding when she first complained about a pay disparity.  Plaintiff alleges that she "first raised her concern about the difference between her compensation and the men at Oasis with Perlberg in November and December 2018 and again on January 4, 2019." PSOF ¶ 124. Ms. Calicchio cites her deposition testimony as supporting this SOF, but it does not, even when viewed in the light most favorable to her.

The cited testimony is as follows: "after the [ICU] unit payout in December [2018]  . . . I had a conversation [with Mr. Perlberg] about whether or not I would have a role in the company." Calicchio Dep. Tr. at 122:2-6.  "I was trying to get from Mr. Perlberg since probably November and December whether or not I was going to have a role . . . [but] he would not have that

46.     For the years 2017 and 2018, Ms. Calicchio was paid less in salary and bonus than her male colleagues, by at least the following amounts: $396,782.22 less than Mr. Castell; $786,624.81 less than Mr. Mayotte; $219,481.23 less than Mr. Viola; and $237,549.95 less than Mr. Steigelfest.  PSOF ¶ 177.[3]

47.     In addition, the value of the ICU awards granted to Ms. Calicchio and her male comparators in 2016 or later are as follows: Mr. Mayotte - $2,858,081; Mr. Viola -

---

conversation . . . he said that . . . he's not privy to discuss that with me. So it wasn't until after the holiday break on January 4th that I had another follow-up meeting with him where we discussed that my role would be going away . . . we did talk in December about the [ICU] units and  . . . I did mention to him that my units were about $200,000 short from what he originally told me I would be receiving." *Id.* at 125:6-19.

The following colloquy also occurred during Ms. Calicchio's deposition:

> Q:      [W]hen did you first raise what you've described as a pay equity issue with Mr. Perlberg?
> A.      Using the word pay equity?
> Q.      Yes.
> A.      January 4th.
> Q.      2019?
> A.      Uh-huh.
>                                *        *        *
> Q.      Did you ever make any specific statement prior to January 4th, 2019 to Mark Perlberg in which you raised or referenced gender, your gender, as compared to the gender of the other individuals to whom you were comparing yourself?
> A.      Not for myself but for others.
> Q.      But not with respect to your compensation?
> A.      No.

*Id.* at 134:7-24.  Thus, Ms. Calicchio's testimony reveals that her conversations with Mr. Perlberg in December 2018 were primarily focused on whether she would have a job at Paychex.  That she also raised her dissatisfaction with her ICU award during this conversation does not support the statement in PSOF ¶ 124 and does not create a disputed fact as to when she first complained of a gender-based pay disparity at Oasis.

[3]  While the parties' calculations differ, they agree that Ms. Calicchio's compensation for the combined years of 2017 and 2018 was less than her comparators by at least these amounts.

$2,198,585; Mr. Castell - $2,839,039; Mr. Steigelfest - $1,201,844; Ms. Calicchio - $904,971.  PSOF ¶ 149.[4]

48.    When Ms. Calicchio raised the pay disparity issue with Mr. Perlberg, he responded, "you're spooking me, Dolores."   Calicchio Dep. Tr. at 132:20.[5]   Ms. Calicchio was "intimidated and treated differently . . . [and] the relationship that [she] had with Mark [Perlberg] changed drastically."  PSOF ¶ 127 (citing Calicchio Dep. Tr. 120:3-6).

49.    Mr. Perlberg "immediately eliminated [Ms. Calicchio] from any meetings, from any interactions . . . from everything . . . [she] was humiliated . . . and left out of everything, dinners he had with his team, meetings they had."  PSOF ¶ 127 (citing Calicchio Dep. Tr. 149:1-10).

50.    Ms. Calicchio complained to Kim Kelly, Paychex's Director of Talent Acquisition, about not being treated fairly with respect to consideration for positions at Paychex and that she believed it was related to her complaint to Mr. Perlberg about pay equity issues; Ms. Kelly said she would look into it but never followed up despite Ms. Calicchio's efforts to follow up.  PSOF ¶ 131.

51.    In January or February of 2019, Mr. Perlberg called and told Ms. Zaucha about his meeting with Ms. Calicchio wherein she raised concerns about her compensation,

---

[4]  Defendants dispute the accuracy of this SOF, but it is based on the deposition testimony of their designated corporate representative, Joseph Mauceri.  *See* Mauceri Dep. Tr. 80:11-81:17 (ECF No. 100-5).

[5]  Mr. Perlberg testified that he does not recall making this statement.  *See* Perlberg Dep. Tr. at 142:5-9.  This lack of recollection does not create a disputed issue of fact.

specifically, the "bonus that she received compared to the bonus other people received." PSOF ¶ 160.

52.     In 2018 and 2019, it was Paychex's practice to investigate claims of discrimination.  PSOF ¶ 159.

53.     Paychex did not investigate Ms. Calicchio's complaint.  According to Ms. Zaucha, "[t]here were no next steps.  [Mr. Perlberg] was informing me of her complaints and that he felt that the way it was handled was fair and equitable and consistent with what they had done the year prior and so there were no next steps." PSOF ¶ 161 (citing Zaucha Dep. Tr. 39:19-40:8 (ECF No. 100-8)).

**Ms. Calicchio's Interest in Employment with Paychex**

54.     On February 18, 2019, Ms. Kelly contacted Ms. Calicchio to see if she would be interested in discussing the position of HR Services Region Manager for Paychex.  Ms. Calicchio indicated her interest would depend on the salary.  Upon learning that the salary was lower than she had expected it to be, Ms. Calicchio decided it was not something she wanted to pursue.  DSOF ¶ 54.

55.     Ms. Calicchio was interested, however, in the position of Director of Centralized Services at Paychex (PSOF ¶¶ 53, 130), but sometime after Ms. Calicchio's January 4, 2019 complaint to Mr. Perlberg about a pay disparity, Paychex offered the position to another Oasis employee, Mary Anne Tate.  DSOF ¶ 49.[6]

---

[6]   The parties dispute the timing of the decisions involving Ms. Tate's employment at Paychex, but the only material fact (which is not disputed) is that Ms. Tate was hired for the Director position sometime after Ms. Calicchio complained to Mr. Perlberg on January 4th.  DSOF ¶¶ 49, 52; PSOF ¶¶ 49, 51, 52.

56.     At Oasis, Ms. Tate worked as the Senior Vice President for Client and Partner Management.  DSOF ¶ 22.  She reported to Mr. Castell and she was responsible for overseeing relationship managers and assisting sales representatives and customers in the field.  DSOF ¶ 50.

57.     Ms. Calicchio was not considered for the Director of Centralized PEO Services position because Paychex viewed the position as a business operations position – a client-facing job providing direction and administrative and operational support to regional PEO staff, working directly with PEO service customers and the Paychex sales force in the field – and Ms. Calicchio was viewed as an HR executive.  DSOF ¶ 53 (citing Zaucha Dep. Tr. 35:14-17 (ECF No. 93-4) and Declaration of Rick Amering, Senior Manager of Human Resources for Paychex (ECF No. 93-7) at ¶ 4).[7]

58.     Ms. Zaucha did not believe Ms. Calicchio had the requisite operational experience for the Director position based on "comments from Mark [Perlberg] that she was an HR executive."  According to Ms. Zaucha, Mr. Perlberg "never referred to [Ms. Calicchio] as any other – as having the skill or ability to do anything else."  *See* Zaucha Dep. Tr. 35:18-36:5.

59.     Mr. Perlberg recommended Ms. Tate for the Director of Centralized Services position at Paychex.  PSOF ¶ 156.

60.     As Mr. Perlberg "understood the role at Paychex . . . it was more of an operations/client service position" and while "[t]here may have been an HR

---

[7]   Ms. Calicchio rejects Paychex's explanation that she was not considered for the job because it did not align with her experience.  She claims that she "was not considered for the job at all."  PSOF ¶ 53.  There is no genuine dispute that she was not considered for the Director position.

component to it . . . the basic nature of [the] position . . . was not an HR position at Paychex." Based on Perlberg's understanding of Ms. Tate's "background and the nature of her qualifications," he testified, "I thought she was, as I understood it, a much better fit for the position than Ms. Calicchio would have been." *See* Perlberg Dep. Tr. 30:20-31:7, 140:21-141:1 (ECF No. 109-1) ("I gave the opinion [to Paychex] . . . that I thought that Mary Anne Tate was better suited to that particular position.").[8]

61.     Ms. Zaucha was not familiar with the duties and responsibilities of the Director of Centralized Services position or with Ms. Tate's qualifications, but she was aware that Mr. Perlberg had recommended Ms. Tate for the position. *See* Zaucha Dep. Tr. 34:16-35:2.

62.     Mr. Perlberg did not advance Ms. Calicchio for any position at Paychex. PSOF ¶ 181.

63.     Ms. Calicchio was unable to secure a position at Paychex before her employment ended. PSOF ¶ 182.

64.     Ms. Calicchio received her final paycheck on or about her last day of employment, May 31, 2019. PSOF ¶ 183.

65.     Ms. Calicchio filed a charge of discrimination with the EEOC on November 7, 2019. The EEOC issued a Right to Sue Letter on December 10, 2019. ECF No. 57 at ¶ 15.

---

[8]  According to Ms. Calicchio, the Director position was the "head role for payroll and relationship management for [Paychex's] clients" and was also responsible for communicating information about benefits (Calicchio Dep. Tr. at 144:19-145:2-3), but Ms. Tate did not have any experience with payroll or benefits and "had absolutely no in depth knowledge, or experience, or training in HR." *Id.* 144:25-145:1; 145:20-22.

## DEFENDANTS' MOTION TO STRIKE

In response to Defendants' motion for summary judgment, Ms. Calicchio proffered a declaration by Vilma Petrovsky, who worked at Oasis from September 2012 until August 2018. ECF No. 100-2 at ¶ 1. For the last six months of her employment Ms. Petrovsky was the Senior Director of Operations and Procurement and she reported to Mr. Mayotte. *Id.* at ¶ 2. According to Ms. Petrovsky, she "regularly attended and participated in senior management meetings." *Id.* Her declaration states in relevant part,

> Based on my experience and observations, I understood and believed that the Chief Financial Officer, Chief Operations Officer and Chief Human Resources Officer were peer positions . . . They each headed up one of the three main divisions of the company. Further, based on my experience and observations, Ms. Calicchio and Mr. Mayotte had more influence on key decision making and on the company overall than Mr. Castell.

> Ms. Calicchio was also a member of the Steering Committee. The steering Committee was made up of Chief Executive Officer Perlberg, Chief Financial Officer Mayotte, Chief Human Resources Officer Calicchio and Chief Operations Officer Castell. The Steering Committee was explained to be the group responsible for setting and executing the strategy for Oasis.

*See* Petrovsky Dec. ¶¶ 3, 4, 5. Ms. Petrovsky also states that she was paid less than male employees who reported to her and that her complaints about this inequity were ignored. *Id.* at ¶ 7. Finally, Ms. Petrovsky opines about what she perceived to be the male-dominated environment at Oasis. *Id.* at ¶ 8.

Defendants move to strike Ms. Petrovsky's declaration as well as the Additional Facts in Plaintiff's SOF (¶¶ 56-63) that are supported solely by the declaration. ECF No. 113. Defendants argue that Ms. Calicchio did not identify Ms.

Petrovsky as a witness in her initial disclosures pursuant to Rule 26(a)(1), nor in response to Defendants' interrogatory asking Ms. Calicchio to name any person she believed to have knowledge or information regarding the subject matter of her claims. *Id.* at 3. Defendants contend that they are prejudiced by the non-disclosure because Ms. Calicchio "relies heavily" on Ms. Petrovsky's declaration to oppose summary judgment and Defendants were prevented from deposing her. *Id.* at 4.

Ms. Calicchio counters that Ms. Petrovsky's declaration should not be stricken because Defendants had "fair notice" of her since she is named on documents produced by Defendants. ECF No. 118 at 1. Ms. Calicchio contends that Ms. Petrovsky's declaration provides necessary rebuttal evidence to impeach Defendants' witnesses, primarily the deposition testimony of Barbara Drames. *Id.* at 2. Finally, Ms. Calicchio argues that Defendants are not prejudiced because they can dispute the evidence in Ms. Petrovsky's declaration. *Id.*

As part of Rule 26's initial disclosures, each party must provide "the name . . . of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs., Inc.*, No. 18-23125-CIV, 2020 WL 509996, at *1 (S.D. Fla. Jan. 31, 2020) (J. Torres) (quoting Fed.

R. Civ. P. 37(c). The party failing to comply with Rule 26(a) bears the burden of establishing that its non-disclosure was either substantially justified or harmless. *Id.* In deciding whether to exclude an undisclosed witness, courts consider "(1) the importance of the testimony, (2) the reason for the [the nondisclosing party's] failure to disclose the witness earlier, and (3) the prejudice to the opposing party if the witness had been [admitted at trial.]" *Id.* at *2 (quoting *Pete's Towing Co. v. City of Tampa, Fla.*, 378 F. App'x 917, 920 (11th Cir. 2010)).

I find that Ms. Calicchio has not met her burden of showing that her failure to disclose Ms. Petrovsky was substantially justified or harmless. Although Defendants were aware of Ms. Petrovsky's existence, they did not have fair notice that Ms. Calicchio would proffer her as a witness to testify about a pattern and practice of unequal pay at Oasis, or the existence of a "male-dominated" environment. Moreover, I find that Ms. Calicchio did not rely upon Ms. Petrovsky's declaration solely as a means of impeaching Defendants' witnesses. Rather, Ms. Calicchio relies heavily on Ms. Petrovsky's declaration to establish a prima facie element of her EPA claim, namely, that she has identified proper comparators who performed equal work. Ms. Petrovsky's statements that the jobs performed by Ms. Calicchio, Mr. Mayotte and Mr. Castell were comparable is Ms. Calicchio's primary support for this element of her EPA claim. ECF No. 102 at 12, 14. Thus, Ms. Petrovsky is an important witness. Ms. Calicchio has offered no justification for failing to disclose Ms. Petrovsky, the nature of her testimony, or Ms. Calicchio's intent to use her to support Ms. Calicchio's

claims.  Defendants are prejudiced by the non-disclosure because they did not depose Ms. Petrovsky, discovery is now closed, and a dispositive motion is pending.

Moreover, I have reviewed the deposition testimony of Barbara Drames (ECF No. 93-6) and I reject Ms. Calicchio's contention that Ms. Petrovsky's declaration falls under Rule 26's exception for impeachment evidence.  Barbara Drames, an Oasis employee for over 20 years, was the company's Senior Vice President of Benefits during Ms. Calicchio's tenure; when Paychex acquired Oasis in 2018, it hired Ms. Drames as its Director of Benefits.  *See* Drames Dep. Tr. 8:5-9:23.  Before the acquisition, Ms. Drames attended senior level staff meetings with Mr. Perlberg, Ms. Calicchio, Mr. Mayotte, and Mr. Castell, *inter alia*.  *Id*. at 11:19-12:3.  Ms. Drames testified that she did not believe Ms. Calicchio's job required a level of effort comparable to Mr. Mayotte's or Mr. Castell's; Ms. Drames believed that Ms. Calicchio's job required less effort.  *Id*. at 14:16-15:15.

> According to Ms. Drames, Mr. Mayotte
>
> ran the entire financial function of the company including mergers and acquisitions; he built how our sales program functioned, how folks were compensated in their sales role, different targets, things of that nature. His hands were basically in almost anything that the company did . . . He's the founder of the company and his scope of responsibilities compared to hers is not comparable.

*Id*. at 15:19-24; 29:19-21.

> Ms. Drames further testified that the same was true of Mr. Castell.
>
> His scope is much larger [than Ms. Calicchio's] . . . he had all of the operations including all of the [clients'] payroll, as well as responsibility for the IT function, for the marketing function, and for the sales function of the company. So if we're looking at both [the] number of folks that

reported through these people or the influence over the clients, that is the basis for my answer.

The majority of the organization had to report up through [Mr. Castell]. Compared to [Ms. Calicchio's] role as Chief HR Officer for the internal employees only, she didn't even have the scope of even the client employees. So if you're looking at it side-by-side . . . his role was larger.

*Id.* at 29:23-24; 16:2-9; 30:5-10.

According to the Eleventh Circuit, Rule 26 provides a "narrow exception that should be limited to circumstances where the evidence offered by the witness plays no role other than impeachment." *Lawson v. Plantation Gen. Hosp., L.P.*, No. 08-61826-CIV, 2010 WL 11504835, at *3 (S.D. Fla. May 3, 2010) (J. Rosenbaum) (quoting *Cooley v. Great S. Wood Preserving*, 138 F. App'x 149, 161 (11th Cir. 2005)).

Significantly, it was Ms. Calicchio who noticed Ms. Drames' deposition, and based on the questioning by Ms. Calicchio's counsel, it is evident that Ms. Drames was expected to testify that she believed women who worked at Oasis were underpaid relative to men in comparable jobs. Ms. Calicchio claims that in a conversation she had with Ms. Drames before her deposition, Ms. Drames said she viewed Ms. Calicchio's role as CHRO to be comparable (in terms of scope of responsibilities and effort required) to the positions held by Mr. Mayotte and Mr. Castell. PSOF ¶¶ 81, 82.[9] Instead, at her deposition Ms. Drames denied any knowledge of how other

---

[9] Faced with these conflicting statements, and viewing the evidence in the light most favorable to Ms. Calicchio, I will disregard Ms. Drames' testimony and accept that this conversation occurred as Ms. Calicchio recalls it. Nevertheless, as explained below, even disregarding Ms. Drames' deposition testimony and accepting Ms. Calicchio's version, I find that Ms. Calicchio has not satisfied her prima facie burden of identifying proper EPA comparators.

employees were compensated and denied ever telling Ms. Calicchio that her position was comparable to that of Mr. Mayotte or Mr. Castell.

I find that Ms. Calicchio's attempt to use Ms. Drames' unexpectedly damaging testimony as a means for opening the door to "impeachment" evidence by Ms. Petrovsky runs afoul of the Federal Rules of Civil Procedure. "[M]erely labeling an individual as a rebuttal witness does not exempt the witness from disclosure. Rebuttal evidence is utilized to respond to matters first introduced by the opposing party and is offered 'to explain, repel, counteract, or disprove the evidence of the adverse party.'" *Lawson*, 2010 WL 11504835, at *3 (quoting *United States v. Lezcano*, 296 F. App'x 800, 803 (11th Cir. 2008)). Ms. Drames was not "first introduced" by Defendants. It was Ms. Calicchio's counsel who elicited the unfavorable testimony from Ms. Drames. Moreover, although Defendants attached Ms. Drames' deposition transcript as an exhibit to their motion, Defendants do not cite to it in their SOF, and make only two fleeting references to Ms. Drames' testimony in their motion. ECF No. 97 at 2, 3. Therefore, Ms. Calicchio is not entitled to present a declaration from Ms. Petrovsky, an undisclosed witness, to counteract or disprove Ms. Drames' testimony.

In sum, because Ms. Petrovsky's declaration includes averments that are offered in support of Ms. Calicchio's case-in-chief, are not solely for impeachment, and do not qualify as proper impeachment evidence, I find that Ms. Petrovsky's declaration, and Ms. Calicchio's SOF that are based on it (ECF No. 101 ¶¶ 56-63), should be stricken. *Lawson,* 2010 WL 11504835, at *3 (court found plaintiff's

"rebuttal witness" is "best characterized as direct testimony that should be presented in plaintiff's case in chief.  Further, the Court agrees with Defendant that to allow the witness to testify as a rebuttal witness would serve as an improper 'second bite at the apple.'").

Even if I considered Ms. Petrovsky's declaration, it would not affect my conclusion that Ms. Calicchio has not identified proper comparators.  The Court must decide as a matter of law whether Ms. Calicchio has satisfied her prima facie burden of identifying male colleagues who performed equal work but were paid more.  *See Blackman v. Fla. Dep't of Bus. & Pro. Regul.*, 599 F. App'x 907, 910 (11th Cir. 2015). As discussed more fully below, that analysis focuses on the actual primary job duties performed by the plaintiff and the asserted comparators.  Ms. Petrovsky's subjective opinions about the similarity of the jobs performed by the CFO, COO and CHRO, and the effort required by each, are not relevant to that analysis.  Ms. Petrovsky's claim that Ms. Calicchio had "more influence on key decision making and on the company overall than Mr. Castell," is unsupported by any specific examples or non-conclusory evidence.  As such, it is insufficient to create a genuine dispute of fact or to materially affect the comparator analysis.

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

### A.    LEGAL STANDARDS

*1.  Summary Judgment Standard*

The legal standard for summary judgment is well-settled:

> A party may obtain summary judgment "if the movant shows that there
> is no genuine dispute as to any material fact and the movant is entitled
> to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may
> support their positions by citation to the record, including *inter alia,*
> depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c).
> An issue is genuine if "a reasonable trier of fact could return judgment
> for the non-moving party." A fact is material if it "might affect the
> outcome of the suit under the governing law." The Court views the facts
> in the light most favorable to the non-moving party and draws all
> reasonable inferences in its favor.
> . . .
>
> The moving party shoulders the initial burden of showing the absence
> of a genuine issue of material fact. Once this burden is satisfied, "the
> nonmoving party 'must make a sufficient showing on each essential
> element of the case for which he has the burden of proof.'" Accordingly,
> the non-moving party must produce evidence, going beyond the
> pleadings, and by its own affidavits, or by depositions, answers to
> interrogatories, and admissions on file, designating specific facts to
> suggest that a reasonable jury could find in his favor.

*Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom)

(citations omitted).

*2.  Equal Pay Act*

The Eleventh Circuit uses a burden shifting framework in cases brought under

the Equal Pay Act.  *Andreu v. Hewlett–Packard Co.*, No. 15-23270-CIV, 2016 WL

1713303, at *10 (S.D. Fla. Apr. 28, 2016) (citing *Irby v. Bittick*, 44 F.3d 949, 954 (11th

Cir. 1995)), *report and recommendation adopted* No. 15-23270-CIV, 2016 WL 4542031

(S.D. Fla. June 8, 2016), *aff'd*, 683 F. App'x 894 (11th Cir. 2017)).

To establish a prima facie case under the EPA, a plaintiff must show that "an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Equal Emp. Opportunity Comm'n v. Univ. of Miami*, No. 19-23131-CIV, 2019 WL 6497888, at *2 (S.D. Fla. Dec. 3, 2019) (J. Scola) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)). The initial burden to demonstrate comparability is "fairly strict." *Heatherly v. Univ. of Alabama Bd. of Trustees*, 778 F. App'x 690, 692 (11th Cir. 2019).

In demonstrating equal work, "the controlling factor under the Equal Pay Act is content -- the actual duties the respective employees are called upon to perform." *EEOC v. Univ. of Miami,* 2019 WL 6497888, at *2 (quoting *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797 (11th Cir. 1989)). The statute does not require the plaintiff and the comparator to have "identical jobs," but rather "substantially equal job content." *Garcia v. Univ. of Miami*, No. 1:12-CV-20009-UU, 2012 WL 12845123, at *5 (S.D. Fla. Dec. 20, 2012) (Ungaro, J.). When determining whether a plaintiff's job is "substantially similar to those of her alleged comparators, our focus is on the primary duties of each job, not on the individual employees holding those jobs, or on incidental or insubstantial job duties." *Heatherly,* 778 F. App'x at 692.

Once the plaintiff establishes a prima facie case under the EPA, the burden then shifts to the defendant to "prove by a preponderance of the evidence that the pay

differential is justified by one of the exceptions set forth in the EPA." *Dimino v. Georgia Dep't of Admin. Servs.*, 631 F. App'x 745, 747 (11th Cir. 2015) (quoting *Irby*, 44 F.3d at 954)). The EPA's four exceptions require the employer to show that its different pay structure is justified due to seniority, merit, quantity or quality of production, or any other fact not related to sex. *Murray v. World Sav. Bank*, 215 F. Supp. 2d 1316, 1320 (S.D. Fla. 2002) (J. Dimitrouleas) (citing 29 U.S.C. § 206(d)(1)). The defendant's burden is "a heavy one" and requires the defendant to show "that none of the decisionmakers . . . were influenced by gender bias." *Dimino*, 631 F. App'x at 747 (citation omitted).

Then, the burden then shifts back to the plaintiff to show pretext by "rebut[ting] the [defendant's] explanation by showing with affirmative evidence that [the employer's affirmative defense] is pretextual or offered as a post-event justification for a gender-based differential." *Id.* at 746 (quoting *Irby*, 44 F.3d at 954).

*3. Timeliness under Title VII*

Prior to filing suit for alleged violations of Title VII, a plaintiff must first exhaust her administrative remedies by filing a timely charge of discrimination with the EEOC. *Restrepo v. Int'l Vapor Grp., Inc.*, No. 16-24208-CIV, 2017 WL 2361942, at *3 (S.D. Fla. May 26, 2017) (J. Lenard) (citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002)). "The timely filing of an EEOC charge is a prerequisite to a Title VII suit." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 100, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). "For a charge to be timely in a

deferral state such as Florida, it must be filed within 300 days of the last discriminatory act." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1271 (citing 42 U.S.C. § 2000e-5(e)(1)). "[O]nly those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable." *Id.* (citing *National R.R. Passenger Corp.*, 536 U.S. 101).

In 2009, Congress enacted the Lilly Ledbetter Fair Pay Act (FPA) to cover serial violations that relate to compensation decisions. *Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 760 (11th Cir. 2011). Under the FPA, a claim accrues with each paycheck that stems from a discriminatory decision irrespective of when the decision was made. *Id.* (citing *Noel v. The Boeing Co.*, 622 F.3d 266, 272 (3d Cir. 2010) ("[P]ursuant to the FPA, each paycheck that stems from a discriminatory compensation decision or pay structure is a tainted, independent employment-action that commences the administrative statute of limitations.")).

The FPA did not, however, alter the limitations period for discrete employment actions. *Tarmas*, 433 F. App'x at 760. Discrete discriminatory acts, such as termination, which are "easy to identify" and therefore "constitute a separate actionable unlawful employment practice," are not actionable if time barred. *Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) (quoting *National R.R. Passenger Corp.*, 536 U.S. at 113–114)).

For purposes of calculating the timeliness of an EEOC charge, the Eleventh Circuit has held that a discrete adverse employment action is "deemed to have occurred when the employer made the final decision and communicated it to the

employee." *Liu v. Univ. of Miami*, 138 F. Supp. 3d 1360, 1369 (S.D. Fla. 2015) (J. Zloch) (quoting *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009), *aff'd sub nom. Wen Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793 (11th Cir. 2017)). *See also Garcia v. Goodwill Indus. of S. Fla., Inc.*, No. 18-25042-CIV, 2019 WL 6052814, at \*3-4 (S.D. Fla. Nov. 15, 2019) (J. Moreno).

### 4. *Title VII Discrimination*

"Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII . . . must make a sufficient factual showing to permit a reasonable jury to rule in her favor. She can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1217 (11th Cir. 2019) ("*Lewis I*").

As the *en banc* Eleventh Circuit has explained:

> When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination."

*Id.* at 1220–21 (citations omitted). Where a plaintiff attempts to satisfy his burden through comparator evidence, he must show that he and the comparators are "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1226.

Another way of proving intentional discrimination is through a "convincing mosaic" of circumstantial evidence that creates a triable issue as to the employer's discriminatory intent. *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*"); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (citations omitted).

   5. *Title VII Retaliation*

Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Eleventh Circuit *en banc* recently summarized the framework for assessing Title VII retaliation claims:

> To make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that "she engaged in statutorily protected activity," (2) that "she suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).
>
> Once the prima facie case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." *Bryant,* 575 F.3d at 1308. The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. *Id.* If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions." *Id.*

*Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (en banc). For purposes of establishing a *prima facie* case, "the proper standard in a retaliation case is the one set out by the Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), and confirmed by this circuit in *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)— the retaliation is material if it 'well might have dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 857 (11th Cir. 2020). The standard is an objective one based on "reactions of a *reasonable* employee," but it also considers context. *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68–69.

To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and

the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (internal quotation marks and citation omitted). The relatedness between the protected activity and adverse action may be demonstrated by temporal proximity. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

As with disparate treatment claims, there is another way to make a prima facie showing of retaliation. Here, again, Ms. Calicchio can choose to rely on "'a convincing mosaic of circumstantial evidence' that would permit a jury to infer that the [defendant] retaliated against [her]." *Calvert v. Doe*, 648 F. App'x 925, 929 (11th Cir. 2016).

## B.   DEFENDANTS' LEGAL ARGUMENTS

Defendants contend that they are entitled to summary judgment on Ms. Calicchio's EPA claims because she has not identified any proper comparators, which is required to establish a prima facie case.   ECF No. 97 at 9-12.   According to Defendants, Mr. Mayotte and Mr. Castell are not proper comparators because they had responsibilities that were significantly greater and materially different than Ms. Calicchio's.   *Id.*   Defendants further argue that the pay disparity between Ms. Calicchio and her purported comparators was justified because it was based on factors other than gender.

Defendants argue that Ms. Calicchio's Title VII claims for discrimination and retaliation that are premised on her termination are time-barred because she failed to file her EEOC charge within 300 days of when Mr. Perlberg communicated the termination decision to her on January 4, 2019.   ECF No. 97 at 15-16.   With regard

to Ms. Calicchio's other discrimination claims, Defendants contend that she cannot establish a prima facie case because there is no evidence that she was treated less favorably than a similarly-situated employee outside her protected class. *Id.* at 16-17. Defendants also contend that Ms. Calicchio cannot establish a discriminatory intent. *Id.* at 19-20. Finally, Defendants argue that Ms. Calicchio cannot establish the causation element of her retaliation claims because the adverse employment actions she cites occurred before she engaged in any protected activity. ECF No. 97 at 17-19.

### C.   DISCUSSION

#### 1. *Equal Pay Act*

Defendants contend that the EPA claims in Counts I-VII of the SAC must fail because Ms. Calicchio cannot establish a prima facie case due to a lack of proper comparators. ECF No. 97 9-11.   Defendants argue that a significant portion of the jobs performed by Ms. Calicchio and her comparators must be substantially identical and that she cannot rest her case on "an apples-to-oranges comparison." *Id.* at 9. Defendants urge the Court to focus on the financial impact each job had on the company and the level of supervisory authority delegated to each position, including the number of subordinate employees and their rank within the corporate structure. *Id.* at 10.

Ms. Calicchio counters that "a female executive can never point to a true comparator for EPA purposes." ECF No. 102 at 10.   Nevertheless, she argues that she has presented four proper comparators: Mr. Mayotte, Mr. Castell, Mr. Viola and Mr. Steigelfest.   According to Ms. Calicchio, the Eleventh Circuit takes a "common

sense" and "pragmatic approach" in determining whether two positions are of equal responsibility, effort and skill, and that "executives of similar stature who, for example, both report to the CEO and manage their respective departments, may be proper comparators notwithstanding that each one does so in a distinct subject area." *Id.*

In making this argument, Ms. Calicchio relies heavily on the Eleventh Circuit's decision in *Mulhall v. Advance Sec., Inc*., where the Court reversed summary judgment for the employer, finding that a jury could conclude that the plaintiff's position as a Vice President of Administration was substantially similar in responsibility, effort, and skill to that of a male corporate department head (Controller) who was paid more.  ECF No. 102 at 9-16 (citing *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 594–595 (11th Cir. 1994)).

In *Mulhall,* the Eleventh Circuit focused primarily on the skills of the two jobs being compared.  As Vice President of Administration, the Court found that Mulhall's responsibilities included risk management, personnel, loss prevention, salary administration, worker's compensation, purchasing, litigation, general liability insurance claims, group insurance programs for hourly personnel, hourly personnel 401(k) programs, salaried employees' payroll, equal employment opportunity, affirmative action, fidelity insurance claims, contract reviews, insurance certification programs, labor relations, applicant and employee testing programs, licensing, leases, corporate services and staff, and the Department of Defense industrial

security program.  Mulhall also had operational responsibility over the government contracts and did short and long-term cost-forecasting.  *Mulhall*, 19 F.3d at 588.

In addition, Mulhall acted as liaison with outside counsel on litigation and determined the company's position on each claim. Mulhall managed all cost, wage, and benefit programs on the government contracts, with responsibility for approximately $5,000,000 per year in those areas alone. She negotiated labor contracts and had a purchasing budget of approximately $2,000,000.  Additionally, she maintained forty-eight leases and renegotiated the corporate headquarter's lease at a savings to the company.  The Eleventh Circuit found that "a jury could find these tasks inextricably intertwined with the corporation's financial future."  *Mulhall*,19 F.3d at 594, n.17.

In comparing Mulhall's job with the Controller's, the Court observed that the skills and responsibilities of the controller position had changed over time, but that for at least the first few years under consideration, "we find nothing in the record defeating plaintiff's contention that the vice presidents' positions were substantially similar . . . [t]hus, we hold that plaintiff established a prima facie case regarding the pay disparity for at least that period."  *Id.* at 593-94.  Despite the changing nature of the controller position, the Court noted that the job's primary skills were to plan, organize, direct and control defendants' accounting and financial functions, including credit collection and billing.  *Id.* at 594.

The Eleventh Circuit stated, "[w]e are not convinced that skills needed in the controller position, even as it is currently structured, are not substantially similar to

those of the vice-president for administration." *Id.* The Court noted that the company's "economic well-being is obviously the controller's main responsibility, but he also manages a staff and credit collection and billing—functions steeped in the administrative tradition. Meanwhile, monetary concerns permeate all aspects of [Mulhall's] position." *Id.* at 594.

The Court continued, "[g]iven our discussion of the skills involved, little analysis of the relative effort demanded to accomplish [Mulhall's and the controller's] jobs is required. Both positions obviously necessitated great effort. If anything, we believe a jury could conclude that [Mulhall's] position, because of its diverse components, took greater effort than did the controller's relatively homogenous job tasks." *Id.*

In considering the jobs' relative levels of responsibility, the Eleventh Circuit observed that

> [B]oth Mulhall and the controller reported directly to Advance's president, and both had ultimate responsibility as corporate heads for their divisions. Both were responsible for millions of dollars in corporate spending. Defendants apparently believe that the ultimate responsibility for corporate money is greater in kind than the ultimate responsibility for administration of the business as a whole. One vice president manages money primarily and people secondarily; the other manages people and things primarily and money secondarily.

*Id.* at 594-95. The Court concluded,

> We cannot agree with the district court that as a matter of law responsibilities inherent in the controller's and Mulhall's positions were not substantially similar.
>
> A reasonable jury could certainly infer, as plaintiff suggests, that her position and that of the controller are substantially similar for purposes

of the EPA.  Accordingly, plaintiff met her burden of establishing a prima facie case regarding the vice president, controller.

*Id.* at 595.

*Mulhall* is distinguishable from the facts here.  First, I note that in assessing the comparative effort required, the Eleventh Circuit highlighted the "homogenous job tasks" of the controller position as compared to the "diverse components" of Mulhall's job, which the Court believed required "greater effort."  *Id.* at 594.  Here, however, Ms. Calicchio's position as CHRO appears to be the homogenous one, whereas Mr. Castell's position as COO entailed many diverse components.  Therefore, in terms of effort required, I am not convinced that Ms. Calichio's position was comparable to Ms. Castell's.

Moreover, the undisputed facts reveal that Ms. Calicchio's primary duties can be distilled to hiring and training, creating and managing processes in her department, preparing for Oasis' sale/acquisition, and responsibility for Oasis' nationwide employee payroll.  Unlike Mulhall who had "ultimate responsibility for administration of the business as a whole" (*id.* at 595), Ms. Calicchio's responsibility was limited to the human resources department.  I am not persuaded by Ms. Calicchio's attempt to compare herself to male colleagues whose responsibilities were at a higher level and more far-reaching.

It is undisputed that Ms. Calicchio, Mr. Mayotte and Mr. Castell were each the head of their departments and were responsible for a number of employees who reported directly to them.  It is significant, however, that the employees who reported to Mr. Mayotte and Mr. Castell were higher-ranking in the company's corporate

structure. Both Mr. Mayotte and Mr. Castell supervised a number of senior management officials, whereas Ms. Calicchio did not. Moreover, the positions of COO and CFO required Mr. Castell and Mr. Mayotte to interact with Oasis' vast array of clients, as well as the owners of Oasis' private equity managers. Without clients and investors, neither Oasis, nor its human resources department, would exist. These distinctions highlight the disparity in the level of skill and responsibility required by Ms. Calicchio's position and that of her alleged comparators.

Similarly, Ms. Calicchio has failed to establish that either Joel Steigelfest (Chief Information Officer) or Mike Viola (Chief Sales Officer) had primary duties comparable to hers. In fact, other than arguing that their positions were subordinate to hers (ECF No. 102 at 14), Ms. Calicchio's SOF provides very little information about the skill, effort and responsibilities required of their positions. Ms. Calicchio merely offers her opinion that Mr. Steigelfest's role "was not as large or as influential as the CHRO, COO and CFO positions." *Id.* at 15. Likewise, with regard to Mr. Viola, Ms. Calicchio states that he "was not involved in decision-making as to Oasis policy, acquisition-strategy or structural changes to [the] organization as the CHRO, COO and CFO were." *Id.*

Based on this record, I find that this case is more akin to *Blackman v. Fla. Dep't of Bus. & Pro. Regul.*, 599 F. App'x 907 (11th Cir. 2015) than it is to *Mulhall.* In *Blackman,* the Eleventh Circuit found that aside from an organizational chart showing that a higher paid male was her subordinate, the plaintiff "introduced almost no evidence regarding the 'skills and qualifications actually needed to perform [the

subordinate's] job." *Blackman,* 599 F. App'x at 910. "Nor did she provide any evidence demonstrating that the actual content of her job and [the subordinate's] job were substantially similar." *Id.* The plaintiff "merely testified, without providing any specifics, that [her subordinate] 'is not required to do the same level of work [nor does he] have the same level of responsibility.' But such conclusory testimony alone is insufficient to create a genuine issue of material fact." *Id.* (citing *S.E.C. v. Monterosso,* 756 F.3d 1326, 1333 (11th Cir. 2014) ("Speculation or conjecture cannot create a genuine issue of material fact[.]"). The Eleventh Circuit concluded that "[b]y leaving the district court in the dark regarding the content of [the subordinate's] position vis-à-vis her position, [the plaintiff] failed to establish a prima facie case under the EPA." *Blackman,* 599 F. App'x at 910.

Viewing the admissible evidence in the light most favorable to Ms. Calicchio, both she and Ms. Drames believed that her position as CHRO was comparable to the positions filled by Mr. Mayotte and Mr. Castell. However, those subjective beliefs are not sufficient to defeat summary judgment when Ms. Calicchio has failed in her burden of presenting facts to show that these positions had substantially equal job content to hers. *See Heatherly,* 778 F. App'x at 692-93 (as Director of HR, plaintiff had different job responsibilities than her alleged male comparators whose jobs had "broader financial impact than hers did;" her comparators managed more than $45 million in medical costs for more than 10,000 employees, managed $400 million in annual pay, and had many more direct-report employees than plaintiff did); *see also Garcia,* 2012 WL 12845123, at *6 (court found "no genuine dispute" as to whether

plaintiff's work as Director of Football Relations was equivalent to that of her comparators. "It was not. Plaintiff's duties concerned the recruitment of prospective student athletes while they are in high school. Her comparators' duties concerned the management of current students as well as management of the team as an institution, including its status within the NCAA and the ACC.").

Given that Ms. Calicchio has not satisfied her burden of presenting a prima facie case with regard to comparators under the EPA, I need not consider whether Defendants have established that the wage differential was for reasons other than gender. Accordingly, Defendants are entitled to summary judgment on Counts I-VII of the SAC.

2. *Title VII Claims*

a. <u>Timeliness</u>

As an initial matter, I find that Ms. Calicchio's Title VII claims in Counts VIII-XI that stem from her termination are time-barred. On January 4, 2019, Mr. Perlberg met with Ms. Calicchio and told her about Paychex's decision to terminate her employment. In order for Ms. Calicchio's EEOC charge based on this discrete employment action to be timely under Title VII, Ms. Calicchio needed to file her charge within 300 days of when she was notified of her termination, in other words, by October 31, 2019. Ms. Calicchio did not file her EEOC charge until November 7, 2019, and thus, her Title VII claims related to her termination are untimely.

Ms. Calicchio fails in her attempt to create a disputed issue of material fact by arguing that Mr. Perlberg told her on January 4, 2019 that "her employment was

projected to end in March *unless she found another position at Paychex*" (ECF No. 102 at 29) (emphasis in original).  This additional fact is not material, nor is the fact that Ms. Calicchio's end date was later extended until May 31, 2019.

As the Supreme Court found in *Delaware State Coll. v. Ricks*, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.,* 449 U.S. 250, 257, 101 S. Ct. 498, 503, 66 L. Ed. 2d 431 (1980).  In *Ricks,* the plaintiff was notified that his teaching contract would expire one year in advance.  The Supreme Court rejected the plaintiff's attempt to extend the limitations period to the last day of his employment contract. The Court observed that "[d]etermining the timeliness of [a plaintiff's] EEOC complaint . . . requires us to identify precisely the 'unlawful employment practice' of which he complains." *Id.* (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889, 52 L. Ed. 2d 571 (1977)).  When the termination of employment is "delayed, but inevitable," the limitations period begins to run when the decision is made; this "protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Ricks,* 449 U.S. 256-57 (citation omitted). Accordingly, the Title VII claims related to Ms. Calicchio's termination are time-barred.

b. Discrimination

Aside from her time-barred claim that her termination was discriminatory, Ms. Calicchio contends in Counts VIII and IX of the SAC that Defendants discriminated against her by denying her opportunities for further employment following Paychex's

acquisition of Oasis and by denying her salary, bonus, and ICU awards.  ECF No. 57

at 17-20.

With regard to Ms. Calicchio's Title VII claim of discriminatory compensation,

she "fails to establish a prima facie case under Title VII for the same reason as her

failure under the EPA: Her comparators were not similarly situated to her."  *Garcia*,

2012 WL 12845123, at *8.  I agree with the court's analysis in *Garcia*.

> Even if the exigencies of the EPA's "equal work" requirement are
> "relaxed" in a Title VII similarity analysis, *see Mulhall*, 19 F.3d at 597,
> the outcome here is the same. *See Gray v. City of Jacksonville*, 116 Fair
> Empl. Prac. Cas. (BNA) 301, at *4 (11th Cir. Oct. 9, 2012) (stating that
> it was "not persuaded" by plaintiff-appellant's argument that Title VII
> and EPA similarity standards are materially different). The same
> analysis applied to Plaintiff's EPA claims, above, applies to her claim
> under Title VII insofar as she must demonstrate that her comparators
> performed substantially similar work . . . Plaintiff's comparators were
> simply not similarly situated, and to allow her to proceed with her prima
> facie case would be inappropriate . . .

*Garcia*, 2012 WL 12845123, at *8.

Likewise, Ms. Calicchio's claims that Defendants discriminated against her by

denying her opportunities for further employment following Paychex's acquisition of

Oasis fails because she cannot demonstrate that similarly situated individuals

outside of her protected class were treated more favorably.  Although I reject Ms.

Calicchio's claim that Mr. Castell and Mr. Viola are similarly situated to her, it is

undisputed that they were also terminated as a result of Paychex's acquisition of

Oasis and there is nothing in the record to suggest that they were given opportunities

for other employment with Paychex.  Moreover, the Paychex job Ms. Calicchio

wanted, Director of Centralized Services, was given to Ms. Tate, who is a member of

her protected class.[10]   Accordingly, Ms. Calicchio has not met her burden of establishing a prima facie case for any of her Title VII claims of discrimination and Defendants are entitled to summary judgment on Counts VIII and IX of the SAC.

c. Retaliation

In Counts X and XI of the SAC, Ms. Calicchio contends that Defendants retaliated against her for engaging in protected activity by "refusing to consider her for positions post-acquisition."  ECF No. 57 at 20-22.[11]  According to Ms. Calicchio, after she raised the pay disparity issue with Mr. Perlberg on January 4, 2019, "she complained to Kim Kelly of Paychex that she was being shut out of positions at Paychex because she had complained about discrimination," but neither her claim of retaliation, nor her underlying claim of discriminatory pay, were investigated.  ECF No. 102 at 26.

Defendants do not dispute that Ms. Calicchio's conversation with Mr. Perlberg on January 4, 2019 constituted protected activity of which they were aware.

---

[10]   Ms. Calicchio also contends that "[n]either Oasis nor Paychex ever investigated [her] complaints, despite that the law and company policy required them to do so" (ECF No. 102 at 26), but the SAC does not identify this failure as an adverse employment action.  To the extent it might be relevant as circumstantial evidence of other actionable discrimination, I find that there are no actionable claims of discrimination that survive Defendants' summary judgment motion.  *See Perry v. Schumacher Grp. of Louisiana*, No. 2:13-CV-36-FTM-29DNF, 2020 WL 6938391, at \*3 (M.D. Fla. Nov. 25, 2020) ("an employer's failure to investigate, standing by itself, does not constitute an adverse employment action for purposes of Title VII") (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010)).

[11]   As noted above, the SAC also alleges that Ms. Calicchio's termination was retaliatory, however, I have already found those claims to be time-barred.  Moreover, Ms. Calicchio could not satisfy the causation requirement of a prima facie retaliation claim because there is no evidence that she engaged in any protected activity before the decision to terminate her was made.  *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

Defendants also do not contest the subsequent treatment Ms. Calicchio alleges (i.e., Perlberg's exclusion of her from meetings and team dinners, as well as his refusal to recommend her for any job at Paychex, and Defendants failure to investigate her claims ); nor do Defendants contest Ms. Calicchio's argument that these instances constitute adverse employment actions.   Additionally, there are factual disputes about the date Paychex decided to hire Ms. Tate for the Director position that Ms. Calicchio wanted, the qualifications needed for that position, and whether Ms. Calicchio was qualified for it.  The combination of uncontested allegations and the disputed factual issues precludes the entry of summary judgment in Defendants' favor on the retaliation claims.

I find that, viewing the evidence in the light most favorable to Ms. Calicchio, she has established a prima facie claim of Title VII retaliation in that she engaged in protected activity when she complained to Mr. Perlberg about a perceived gender-based pay disparity, and she has produced sufficient circumstantial evidence that she was immediately subject to adverse employment actions because of her complaint. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008)) (the "causal link" element is construed "broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated") (citations and quotation marks omitted).[12]   Moreover, I find that the

---

[12]   Defendants contend that Ms. Calicchio cannot establish causation because Paychex had already decided to release Ms. Caliccchio from her role as CHRO in 2018, before she complained to Mr. Perlberg.  However, the pertinent adverse actions alleged are Mr. Perlberg's exclusion of Ms. Calicchio from meetings and dinners, his recommendation of Ms. Tate for the job Ms. Calicchio wanted, and his refusal to recommend Ms. Calicchio for any role at Paychex – all of which occurred after her January 4th complaint.

adverse actions Ms. Calicchio alleges might well have dissuaded a reasonable worker from making a similar complaint.

Specifically, the facts, when viewed in the light most favorable to Ms. Calicchio, reveal that Mr. Perlberg responded to her allegations of a pay disparity by saying "you're spooking me," and then acting in an intimidating manner, treating her differently, and eliminating her from meetings and team dinners. ECF No. 102 at 28 (citing PSOF ¶ 127). The undisputed facts reveal that Mr. Perlberg never advanced Ms. Calicchio for any positions at Paychex, but he did recommend Ms. Tate for the Director position that Ms. Calicchio wanted. Viewing the facts in the light most favorable to Ms. Calicchio, Mr. Perlberg asked Ms. Zaucha if Ms. Calicchio "might conceivably be retained" by Paychex before she complained to him about the pay inequity, whereas after she complained, he recommended Ms. Tate for the Director position.

The evidence further establishes that Mr. Perlberg was a decision-maker because he was very influential in deciding who Paychex would hire for certain positions. It is undisputed that he knew of Ms. Calicchio's protected activity because he was the recipient of her initial complaint on January 4, 2019. His negative treatment of Ms. Calicchio after she complained to him and his ambiguous statement that she was "spooking" him, suggest a retaliatory intent which is only exacerbated by the close temporal proximity of these events. Moreover, high-level Paychex employees, Laurie Zaucha and Kim Kelly, were also aware of Ms. Calicchio's protected activity but deferred to Perlberg's judgment in deciding not to investigate

her complaints of discriminatory pay or retaliation. Paychex also acquiesced to Mr. Perlberg by offering Ms. Tate the Director position, while not even considering Ms. Calicchio for an interview.

Ms. Calicchio's prima facie case creates a "presumption that the adverse action was the product of an intent to retaliate" and the burden of production then shifts to Defendants to rebut the presumption by articulating legitimate, non-discriminatory reasons for their employment actions. *Bryant,* 575 F.3d at 1308. The defendant's burden of proffering a legitimate non-discriminatory reason "is a low bar to hurdle." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). Nevertheless, the employer must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

I am not convinced that Defendants have met their burden here. Mr. Perlberg offered only cursory testimony regarding his "understanding" that Ms. Tate was "better suited" for the Director position than Ms. Calicchio.[13] Moreover, Defendants fail to offer any explanation for Mr. Perlberg's exclusion of Ms. Calicchio from meetings, his refusal to recommend her for any position at Paychex, and Paychex's decision not to investigate Ms. Calicchio's claims. For these reasons I find that Defendants have not satisfied their burden of presenting legitimate non-

---

[13] Ms. Calicchio's testimony that the Director position required human resources experience and that Ms. Tate had none, creates a disputed issue of fact regarding the qualifications for the Director position. Defendants have not proffered a job description or any other evidence to support Mr. Perlberg's understanding of the job's requirements.

discriminatory reasons for the adverse actions Ms. Calicchio has alleged. Accordingly, Ms. Calicchio's claims of Title VII retaliation in Counts X and XI of the SAC should be allowed to proceed.

## **RECOMMENDATION**

Based on the foregoing, I **RECOMMEND** that:

1. Defendants' Motion to Strike the Declaration of Vilma Petrovsky and the corresponding paragraphs in PSOF (ECF No. 113) be **GRANTED**; and

2. Defendants' Motion for Summary Judgment (ECF No. 97) be **GRANTED IN PART AND DENIED IN PART** in that the Equal Pay Act claims in Counts I-VII of the SAC be dismissed, the Title VII discrimination claims in Counts VIII and IX of the SAC be dismissed, and the Title VII retaliation claims in Counts X and XI proceed to trial.

## **NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Rodolfo A. Ruiz, II, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.

DONE AND SUBMITTED in Chambers this 28th day of April, 2021, at West Palm Beach in the Southern District of Florida.

_____

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE