# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-81292-RAR

**DOLORES CALICCHIO**,

     Plaintiff,

v.

**OASIS OUTSOURCING GROUP
HOLDINGS, L.P.,** *et al.,*

     Defendants.

_____/

### ORDER AFFIRMING AND ADOPTING IN PART REPORT AND RECOMMENDATION, GRANTING DEFENDANTS' MOTION TO STRIKE, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon United States Magistrate Judge Bruce E. Reinhart's Report and Recommendation [ECF No. 125] ("Report"), filed on April 28, 2021. The Report recommends that the Court grant Defendants' Motion to Strike the Declaration of Vilma Petrovsky [ECF No. 113] and grant in part and deny in part Defendants' Motion for Summary Judgment [ECF No. 97] ("MSJ"). Plaintiff and Defendants filed respective objections to the Report [ECF Nos. 128, 129] and responses to their counterpart's objections [ECF Nos. 130, 131]. The Court also permitted Plaintiff to file a Reply to Defendants' Response to Plaintiff's Objections [ECF No. 132-2] and allowed Defendants to submit a corresponding Response [ECF No. 135]. Having reviewed the Report, objections, and responses, conducted a *de novo* review of the record, and being otherwise fully advised in the premises, it is

**ORDERED AND ADJUDGED** as follows: 1) the Report [ECF No. 125] is hereby **AFFIRMED AND ADOPTED IN PART** as supplemented herein; 2) Defendants' Motion to

Strike the Declaration of Vilma Petrovsky [ECF No. 113] is **GRANTED**; and 3) Defendants'
Motion for Summary Judgment is **GRANTED**.

## **BACKGROUND**

Except where specifically stated otherwise, the Court adopts in full the Report's detailed
discussion of the relevant undisputed material facts as borne out by the record.  *See* Rep. at 2-15.
For posterity's sake, however, the most relevant undisputed facts are set forth below.

This is an employment discrimination action in which Plaintiff Dolores Calicchio brings
claims against her former employer, Oasis, and its related entities, as well as Paychex, the
corporation that acquired Oasis.  Specifically, in her Second Amended Complaint [ECF No. 57],
Plaintiff alleges claims under the Equal Pay Act ("EPA"), 29 U.S.C. section 206(d), and Title VII
of the Civil Rights Act, 42 U.S.C. section 2000e *et seq*., against the seven Defendants: Oasis
Outsourcing Group Holdings, L.P.; Oasis Outsourcing Holdings, Inc.; Oasis Outsourcing Group
Holdings, GP, LLC; Oasis Outsourcing Acquisition Corp.; and WRI II, Inc. (collectively referred
to as "Oasis"); as well as Paychex, Inc. and Paychex North America, Inc. (jointly referred to as
"Paychex").

Oasis is a Professional Employer Organization (PEO) that provides outsourced services
such as payroll, benefits, and human resources operations to its client companies.  Mark Perlberg
served as its CEO and was the chief decisionmaker regarding executive compensation, though he
needed board approval of salary decisions.  Plaintiff joined Oasis as its Chief Human Resources
Officer in 2017 and was the only woman reporting directly to the CEO.   She asserts that she was
unlawfully paid less based on her sex and seeks to support those claims by comparing her
compensation to that of four male comparators: Executive Vice President and Chief Financial

Officer Terry Mayotte; Chief Operating Officer Kelley Castell; Chief Sales Officer Michael Viola; and Chief Information Officer Joel Steigelfest.  For the years 2017 and 2018, Plaintiff was paid less in salary and bonus than her male colleagues by at least the following amounts: $786,624.81 less than Mr. Mayotte; $396,782.22 less than Mr. Castell; $219,481.23 less than Mr. Viola; and $237,549.95 less than Mr. Steigelfest.

As part of its compensation package offer to new candidates for management positions, Oasis issued Incentive Common Units ("ICUs"), which permitted its holders to receive a portion of the proceeds of any sale of the company.   The value of the ICU awards granted to Plaintiff and her male comparators in 2016 or later are as follows: Mr. Mayotte - $2,858,081; Mr. Castell - $2,839,039; Mr. Viola - $2,198,585; Mr. Steigelfest - $1,201,844; Plaintiff - $904,971.

In December 2018, Oasis was acquired by Paychex, a company providing similar services, in a transaction valued at approximately $1.2 billion.  As part of that process, Paychex determined which Oasis employees would be offered positions when the two organizations merged.  In a meeting with Paychex executives, Mr. Perlberg described Plaintiff as a competent human resources professional but indicated that Paychex did not need to retain her because the position she held at Oasis was already filled at Paychex by Laurie Zaucha.  On January 4, 2019, Mr. Perlberg met with Plaintiff and told her that her employment would end on March 31, 2019, although her final date of employment was ultimately pushed back to May 31, 2019.[1]

---

[1] On this fact, the Court disagrees with the Report's characterization that Plaintiff was told her employment would end "if she did not secure another position with Paychex." Rep. at 10.  For the reasons explained *supra*, the Court finds that it is an undisputed fact that Ms. Calicchio was told unequivocally on January 4, 2019 that her employment with Oasis would be ending on March 31, 2019.

Plaintiff first raised the "pay equity issue" with Mr. Perlberg during their January 4, 2019 meeting when he notified her of her end-date.  Mr. Perlberg responded, "you're spooking me, Dolores," and Mr. Perlberg then began leaving Plaintiff out of meetings and team dinners.

There were two positions Plaintiff was interested in at Paychex.  The first was Human Resources Services Region Manager, but Plaintiff declined to pursue this role upon learning that the salary was lower than she had expected.  The second position was the Director of PEO Centralized Services at Paychex, but sometime after Plaintiff's January 4, 2019 complaint to Mr. Perlberg about a pay disparity, Paychex offered the position to another Oasis employee, Mary Anne Tate.  According to Defendants, Plaintiff was not considered for the Director of PEO Centralized Services position because Paychex viewed it as a business operations position—a client-facing job providing direction and administrative and operational support to regional PEO staff, working directly with PEO service customers and the Paychex sales force in the field—whereas Plaintiff was viewed as a human resources executive.  Mr. Perlberg recommended Ms. Tate for the Director of PEO Centralized Services position at Paychex and did not recommend Plaintiff for this position.  Plaintiff argues that Defendants' refusal to consider her for the Director of PEO Centralized Services position was in retaliation for raising the gender pay disparity issue with Mr. Perlberg.

Plaintiff asserts eleven claims in the Second Amended Complaint [ECF No. 97] ("SAC"), including a claim for EPA violations against each of the seven Defendants (Counts I-VII), and Title VII claims for gender discrimination and retaliation against Defendants Oasis Outsourcing Group Holdings, L.P. and Paychex North America, Inc. (Counts XIII-XI).  In response to Defendants' Motion for Summary Judgment, Plaintiff submitted a declaration from Vilma

Petrovsky, the Senior Director of Operations and Procurement at Oasis. Her Declaration attests to the relative influence and responsibilities of Plaintiff and her proffered comparators, Ms. Petrovsky's experience with being paid less than male employees who reported to her, and her perceptions of a male-dominated environment at Oasis. Decl. of Vilma Petrovsky [ECF No. 100-2] ¶¶ 3-5, 7-8. Defendants filed a Motion to Strike that Declaration as well as the facts contained in Plaintiff's Statement of Material Facts [ECF No. 101] that rely solely on the Declaration, arguing that Plaintiff did not identify Ms. Petrovsky as a witness during discovery and Defendants were prejudiced by that nondisclosure.

On April 28, 2021, Magistrate Judge Reinhart issued his Report in which he concluded: 1) the Petrovsky Declaration should be stricken because Plaintiff did not show that her failure to disclose her as a witness was substantially justified or harmless and Defendants were prejudiced as a result; 2) Plaintiff did not meet her burden of establishing a *prima facie* case under the EPA because she did not show that her job was substantially equal to her proffered comparators; 3) for the same reason, Plaintiff's Title VII claims for gender pay discrimination also fail; 4) Plaintiff's Title VII claims stemming from her termination are time-barred because she initiated this action more than 300 days after she was told unequivocally that she would be terminated; and 5) a reasonable juror could conclude that Defendants retaliated against Plaintiff in violation of Title VII due to her raising the issue of a gender pay disparity with Mr. Perlberg. Put simply, the Report recommends allowing only the Title VII retaliation claims in Counts X and XI proceed to trial.

## LEGAL STANDARD

The Court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). Those portions of the Report to which an objection is made are accorded *de novo* review so long as those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). Any portions of the Report to which no specific objection is made are reviewed only for clear error. *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.,* 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001)*; accord Macort v. Prem, Inc*., 208 F. App'x 781, 784 (11th Cir. 2006).

The legal standards for deciding whether summary judgment is proper are well-settled. Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of the "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at

*2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

Further, when the parties "agree on the basic facts, but disagree about the inferences that should

be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added

and citation omitted).

## ANALYSIS

Plaintiff makes eight objections to the Report, including both legal and factual objections.

First, Plaintiff argues that the Report erred by not following on-point precedent from the Eleventh

Circuit regarding Plaintiff's *prima facie* EPA claim.  Second, Plaintiff argues that the Report

improperly weighed the credibility of witnesses in favor of Defendants and disregarded key

evidence submitted by Plaintiff on the issue of proper comparators for her wage discrimination

claims under the EPA and Title VII.  Third, Plaintiff submits that the Report erred by disregarding

that two men in positions subordinate to Plaintiff received more compensation than her.  Fourth,

Plaintiff contends that the Report failed to apply the Eleventh Circuit's "more relaxed" standard

for establishing a comparator under a Title VII wage discrimination claim as compared to an EPA

claim.  Fifth, Plaintiff argues that the Report ignored other key evidence demonstrating

discrimination by Defendants separate and apart from the direct evidence of the comparators.

Sixth, Plaintiff argues that the Report erred by excluding the Petrovksy Declaration.  Seventh,

Plaintiff argues that the Report erred by finding Plaintiff's Title VII claims to be time-barred.  And

finally, eighth, Plaintiff argues that the Report erred by limiting the retaliation claims to Title VII,

insisting that such claims were brought under the EPA as well.

Defendants oppose each of Plaintiff's objections and submit two objections of their own.

First, Defendants contend that the Report's analysis of Plaintiff's retaliation claims is premised on

certain adverse employment actions Plaintiff never alleged in her pleadings.  And second, Defendants argue that the Report applied an incorrect legal standard to the analysis of Plaintiff's retaliation claims by failing to evaluate whether the adverse employment action was the "but for" consequence of Plaintiff's alleged protected activity.

For clarity, the Court analyzes the claims as if it were writing anew and acknowledges the objections throughout its analysis.  For that reason, although the Court addresses each objection, it does not do so in the order in which they were presented by the parties.

## I.   DEFENDANTS' MOTION TO STRIKE THE PETROVSKY DECLARATION

Because a motion for summary judgment requires the Court to assess the evidence in the record, the Court must first decide what evidence should be *in* the record.  Thus, the Court begins with Plaintiff's objection to the Report's decision to strike the Declaration of Vilma Petrovsky. When a magistrate judge rules on a pretrial matter, such as a motion to strike a declaration submitted in opposition to a motion for summary judgment, "[a] judge of the court may reconsider [that matter] . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *see also, e.g.*, *Dwyer v. Charles R. Tutwiler & Assoc., Inc.*, No. 6:18-cv-2038-Orl-28GJK, 2020 WL 1431600, at *1 (M.D. Fla. Jan.15, 2020).  Inasmuch as the Report's conclusion on the Motion to Strike the Declaration of Vilma Petrovsky does not dispose of a claim or defense of any party, the Court reviews this ruling for clear error, meaning the Court will "overturn the [] ruling only if . . . left with the definite and firm conviction that a mistake has been made." *Triolo v. United States*, No. 3:18-cv-919-J-34JBT, 2019 WL 5704659, at *1 (M.D. Fla. Nov. 5, 2019) (citations omitted).   The Court finds no such mistake here.

It is undisputed that Plaintiff did not identify Ms. Petrovsky as a witness in her initial disclosures pursuant to Rule 26(a)(1), nor in response to Defendants' interrogatory asking Plaintiff to name any person she believed to have knowledge or information regarding the subject matter of her claims.  Rule 26 of the Federal Rules of Civil Procedure requires a party to disclose "each individual likely to have discoverable information" and imposes an ongoing duty to supplement or correct such disclosures.  FED. R. CIV. P. 26(a), (e).  If a party fails to comply with the disclosure requirements of Rule 26, then that party is not allowed to use the undisclosed information or witness as evidence on a motion unless the failure to disclose "was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(1).  In determining whether an undisclosed witness should be excluded under Rule 37(c), courts consider "the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party."  *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008) (quoting *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chem. Corp.*, 684 F.2d 776, 780 (11th Cir. 1982)).

As for substantial justification, Plaintiff contends that the failure to disclose Ms. Petrovksy as a witness was because she did not know Ms. Petrovsky would be needed until another witness pulled an "about face" at her deposition and provided unexpectedly damaging testimony. The Report correctly deduced that Ms. Petrovksy's Declaration was submitted in response to unexpectedly damaging testimony from Barbara Drames, the Director of Benefits at Paychex and the former Senior Vice President of Benefits at Oasis.  Plaintiff insists that the Report "ignores the facts leading to Drames['] 'about-face' at her deposition."   Pl.'s Objs. to Rep. and Recommendation Regarding Defs.' Mot. for Summ. J. and Mot. to Strike [ECF No. 128] ("Pl.'s Objs.") at 15.  Specifically, Plaintiff states that "Drames said one thing to Plaintiff prior to the

Drames deposition and something different at her deposition.  In the interim, her current boss – Mayotte – talked to her about her deposition.  In addition, Defendants' counsel (outside and in-house) prepared Drames for her deposition, even though Drames did not request any legal assistance." *Id*.

Plaintiff fails to explain why these events justify her nondisclosure of Petrovsky as a witness.  To the extent that Plaintiff means to argue that she did not know Petrovsky would be a necessary witness until Drames' deposition, this argument fails because the deposition of Ms. Drames occurred well before the dispositive motion deadline, when Defendants still would have had an opportunity to depose Ms. Petrovsky.  *See Johnson v. Airbus Defense & Space Inc.*, --- F. App'x ---, 2021 WL 2134862, at *4 (11th Cir. May 26, 2021).

In *Johnson*, the plaintiffs explained that the reason they did not disclose a witness prior to submitting an affidavit in opposition to a motion for summary judgment was because they did not know that the witness would be necessary until they learned "new information" at the deposition of another witness.  *Id*.  But the Eleventh Circuit found that explanation "implausible" because the deposition in question took place before both the discovery deadline and the dispositive motion deadline.  *Id*.  Here, Ms. Drames' deposition occurred on November 9, which was the discovery deadline.  Dep. of Barbara Drames [ECF No. 93-6]; Am. Scheduling Order [ECF No. 56] at 2.  And the very next day, the Court granted the parties' Joint Motion to Extend Trial Deadlines and Continue Trial [ECF No. 88], which extended the dispositive motion deadline to December 23, 2020.  Moreover, the Court's Amended Scheduling Order made clear that the parties could either by agreement, or with the consent of Magistrate Judge Reinhart, extend the discovery deadline so long as it did not interfere with other Court deadlines.  Am. Scheduling Order [ECF No. 56] at 2

n.2.  Therefore, as in *Johnson*, Plaintiff had ample opportunity to disclose her intent to use Ms.

Petrovsky as a witness at a time when Defendants could have taken her deposition.

Plaintiff also argues that the Report erred in finding that the nondisclosure was not harmless

since Defendants were aware of the existence of Petrovsky throughout the discovery process.

However, "Rule 26 [] requires disclosure not only of the identity of the potential witness but also

the subjects of his likely testimony."  *Osburn v. Hagel*, No. 2:12cv349, 2014 WL 4635447, at *3

(M.D. Ala. Sept. 15, 2014); *see also* FED. R. CIV. P. 26(a)(1)(A)(i) (requiring parties to provide the

identities of individuals "likely to have discoverable information—*along with the subjects of that*

*information*—that the disclosing party may use to support its claims or defenses") (emphasis

added).  Plaintiff points to a handful of documents produced in discovery and introduced at

depositions that list Ms. Petrovsky's name, such as organizational charts showing Ms. Petrovsky's

position within the reporting structure of the company.  However, those documents do nothing to

combat the Report's conclusion that "[a]lthough Defendants were aware of Ms. Petrovsky's

existence, they did not have fair notice that Ms. Calicchio would proffer her as a witness to testify

about a pattern and practice of unequal pay at Oasis, or the existence of a 'male-dominated'

environment."  Rep. at 18.  After all, Ms. Petrovksy was an employee of Defendants, so it should

be expected that Defendants knew of her existence, but that does not impute to Defendants

knowledge of her discoverable information.  To hold otherwise would be to hold that any employee

of an organization that appears on any company document produced in discovery need not be

disclosed, a practice that meets neither the letter nor the purpose of Rule 26.

While a party need not disclose the "exact extent" of a witness's knowledge, the Court will

strike the evidence from that witness unless it is persuaded that "the subject matter of their

knowledge, to the extent [the party was aware]," was timely disclosed or made known to the opposing party during the discovery process. *Graley v. TZ Ins. Solutions, LLC*, No. 2:14-cv-636-FtM-CM, 2016 WL 4595066, at *4 (M.D. Fla. Sept. 2, 2016). This principle is made clear in the authority relied on by Plaintiff. *See, e.g.*, *Matrix Health Grp. v. Sowersby*, No. 18-61310, 2019 WL 4929917, at *4 (S.D. Fla. Oct. 7, 2019) (denying motion to strike a declaration from an undisclosed witness where "[t]here [was] no question that [the witness]—*and the relevant information he possessed*—was made known to [the opposing party] during the discovery process . . . [B]oth [the witness]'s name *and his role in the events that precipitated this lawsuit* were referenced dozens of times during [the defendant]'s deposition.") (emphases added); *Wajcman v. Inv. Corp. of Palm Beach*, No. 07–80912, 2009 WL 465071, at *5 (S.D. Fla. Feb. 23, 2009) (refusing to strike an undisclosed witness where the opposing party "was well aware of [the witness]'s existence *and significance*") (emphasis added). None of the documents on which Ms. Petrovsky's name appears gives any indication as to the subject matter of her testimony, nor was she even referenced at any deposition. The Report was therefore correct to conclude that the nondisclosure was not harmless.

Finally, Plaintiff argues that she did not need to disclose Ms. Petrovsky because her testimony was used as impeachment. But Rule 26 only permits nondisclosure of a witness if that individual is used "*solely* for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i) (emphasis added). While Plaintiff insists that Ms. Petrovsky's testimony was needed to rebut the testimony of Ms. Drames, the Report explained that it was Plaintiff herself who elicited the unfavorable testimony from Ms. Drames. Rep. at 21. Moreover, Plaintiff relies on Ms. Petrovsky's Declaration in her case-in-chief to show that her position was a "peer position" to those of Mr. Castell and Mayotte

and thus that they are proper comparators.  *See, e.g.*, Pl.'s Resp. in Opp. to Defs.' Mot. for Final Summ. J. [ECF No. 102] ("MSJ Resp.") at 7.  Thus, the Report correctly found that Ms. Petrovsky's Declaration was not used solely for impeachment.  The Declaration was properly stricken along with the facts in Plaintiff's Statement of Facts that are based on it.

## II.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  The Equal Pay Act Claims

Plaintiff's claims under the EPA are found in Counts I-VII of her Second Amended Complaint.  The Court adopts in full the Report's conclusions regarding the insufficiency of Plaintiff's EPA claims and supplements those conclusions herein.

Gender-based discrimination in rates of pay to employees is prohibited by the Equal Pay Act of 1963.  Courts in this circuit analyze claims under the EPA using a burden-shifting framework similar to that employed in the Title VII context.  To establish a *prima facie* case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions*."  Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir. 1998) (internal quotation marks omitted).  Although a "plaintiff need not prove that the job held by her male comparator is identical to hers," she must nevertheless demonstrate "that the skill, effort, and responsibility required in the performance of the jobs are substantially equal." *Lima v. Fla. Dep't of Children and Families*, 627 F. App'x 782, 786 (11th Cir. 2015) (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992)).  A plaintiff therefore fails to make a *prima facie* case of unequal pay if the job responsibilities of her alleged comparator were greater than her own. *See Waters v. Turner, Wood*

*& Smith Ins. Agency, Inc.*, 874 F.2d 797, 799-800 (11th Cir. 1989).  "[T]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994) (internal quotation marks and alterations omitted).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to prove "by a preponderance of the evidence . . . that the [pay] differential is justified by one of four exceptions set forth in the EPA . . . '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting 29 U.S.C. § 206(d)(1)).  If the employer demonstrates that "the factor of sex provided *no basis* for the wage differential," the plaintiff must show that the proffered explanation is either "pretextual or offered as a post-event justification for a gender-based differential." *Id*. (internal quotation marks omitted) (emphasis in original).

### i) *Plaintiff's* **Prima Facie** *Case*

The Court first takes stock of the job responsibilities of Plaintiff and her four proffered comparators.  As the Report explained, Plaintiff's primary duties as CHRO included: spearheading all human resources processes and practices to align with business growth; implementing new training for improved sales and operations performance; managing human resources strategy development and executing initiatives aligned to business objectives; developing new employee engagement programs; improving leadership talent pipeline for sales offices growth and expansion; creating new processes for performance management, compensation strategy, and execution; managing processes and design for reorganizing workforce and growth initiatives to

prepare for the company's sale/acquisition; leading acquisition integration efforts for employee systems, processes, and policy; designing a regional model strategy to enhance customer service and retention; assessing talent to fill internal and external roles; attending and presenting at quarterly board meetings; executive coaching; recruiting and training; and managing payroll for Oasis employees nationwide, which was the company's single biggest cost. Rep. at 6-7. She had nine employees who reported directly to her, though none were Executive Vice Presidents or Senior Vice Presidents. *Id*. at 7.

As COO, Mr. Castell was the highest-ranking executive responsible for the day-to-day operation of Oasis and the delivery of its services to its clients. *Id*. Mr. Castell supervised eight management officials who reported directly to him, including the Chief Sales Officer, Chief Marketing Officer, Chief Information Officer, and four Senior Vice Presidents. *Id*.

Terry Mayotte served as an Executive Vice President and the company's Chief Financial Officer. *Id*. at 8. He was responsible for the preparation of financial reports; summaries and forecasts of business and business growth; income statements; balance sheets; reports to private equity owners; tax returns and related materials; and interaction with the Board of Directors and owners of the private equity managers of Oasis. *Id*. Mr. Mayotte supervised management officials responsible for financially-related aspects of Oasis's services, including the Controller of Oasis, its Director of Tax, its Senior Director of Compliance and Integration, its Senior Vice President of Benefits, its Senior Director of Procurement, its Senior Director of Business Analytics and Reporting, and its Senior Director of Risk and Safety Services. *Id*.

Michael Viola was Oasis's Chief Sales Officer and was responsible for driving external sales to clients.  *Id*.  He had one or two employees who reported directly to him.  *Id*.

Joel Steigelfest was the Chief Information Officer at Oasis and was the highest-ranking employee overseeing the Information Technology division of Oasis.  *Id*.  He was responsible for overhauling the company's technology with new software and had three employees who reported directly to him.  *Id*.

The Court agrees with the Report that Plaintiff has not established a *prima facie* case of pay discrimination under the EPA because she has not met her "heavy burden of proving substantial identity of job functions."  *Waters*, 874 F.2d at 799.  While Plaintiff and each of the comparators are high-level executives, the record shows they undertook distinct primary tasks and maintained differing portfolios of responsibility.  Though there might have been some minor overlap in job functions—such as Plaintiff dealing with financial issues like payroll and executive compensation in conjunction with Mr. Mayotte, who was responsible for all of the company's finances—"[b]road similarities between a small percentage of [the comparator]'s job and Plaintiff's job . . . are inadequate."  *Fail v. Univ. of Ala. Ophthalmology Serv. Found.*, No. 2:16-cv-01393, 2018 WL 3495862, at *6 (N.D. Ala. July 20, 2018).

While the record does not shed as much light on the relative effort required by the different positions in terms of hours or energy, it is clear that the duties and skills required for Plaintiff's job were limited to those needed for human resources tasks, which differ materially from all of her comparators and are more narrow than those required from Mr. Mayotte and Mr Castell.  Mr. Mayotte's primary job duties as Chief Financial Officer required the ability to oversee all financial aspects of Oasis's business, including tax; compliance and integration; benefits; business analytics

and reporting; risk and safety services; and procurement.  Likewise, Mr. Castell was responsible for all day-to-day operations of Oasis, rendering him responsible for—and thus requiring a proficiency in—the full spectrum of Oasis's business, including sales, marketing, client services, and information technology.[2]  And as the Report explained, both Mr. Mayotte and Mr. Castel were required to interface with Oasis's clients and the owners of Oasis's private equity managers, another responsibility and skill that differentiated their jobs from Plaintiff's.

The same is true for Mr. Steigelfest and Mr. Viola.  Plaintiff herself describes Steigelfest's primary job duties as "responsibil[ity] for IT companywide" and "overhauling [the company's] outdated technology with a new software."  Pl.'s Resp. to Defs.' Statement of Material Facts and Statement of Additional Material Facts [ECF No. 101] ("PSOF") ¶ 168.  Plaintiff does not explain how that is substantially equal to her tasks, nor does she demonstrate that it requires equal skill. Similarly, Plaintiff states that Mr. Viola's primary duties as Chief Sales Officer were "to drive external sales to clients." *Id.* ¶ 171.  It is undisputed that Plaintiff did not have these responsibilities

---

[2] In her attempt to convince the Court that her position was substantially similar to Mr. Castell's, Plaintiff tells the Court that "according to [its] job description, the 'most important' part of the COO's job was the design and implementation of business strategies, plans and procedures, but Castell never actually performed that task but Plaintiff did."  MSJ Resp. at 9.  There are two problems with this assertion.  First, and most importantly, that is not what the cited portion of the record reflects.  Plaintiff cites to her own deposition, where she stated that Mr. Castell "did not design *human resources* initiatives."  Calicchio Dep. at 197:9-19 (emphasis added).  That only underscores that her responsibilities differed materially from those of Mr. Castell.  Second, she admitted just prior to that portion of her testimony that the very job descriptions she was referencing were "simplified . . . to warrant what a typical job description might read as" in order to provide a simple form of documentation for the acquiring company, Paychex, during the due diligence process.  *Id.* at 196:10-16.  But "in alleging th[e] necessary equality [under the EPA], a plaintiff may not rely on broad generalizations at a high level of abstraction."  *Spencer v. Va. St. Univ.*, 919 F.3d 199, 204 (4th Cir. 2019).  And regardless, "[i]t is the actual job content, not job titles or descriptions that is controlling."  *Blackman v. Fla. Dep't of Bus. Pro. Reg.*, 599 F. App'x 907, 911 (11th Cir. 2015) (citation and quotation omitted).

herself, nor does Plaintiff suggest that the skill set necessary to "drive external sales to clients" is "substantially equal" to the skill set required by her role as Chief Human Resources Officer.

In a further objection to the Report's consideration of Mr. Steigelfest and Mr. Viola as potential comparators, Plaintiff contends that "the [Report] concedes but disregards that [these] two men in positions *subordinate* to plaintiff received more compensation than her." Pl.'s Objs. at 12 (emphasis in original). However, the mere fact that a subordinate is paid more than a party does not establish the subordinate as a proper comparator where the unrebutted evidence shows that the job duties are not substantially equal. *See Blackman v. Fla. Dep't of Bus. Pro. Reg.*, 599 F. App'x 907, 910 n.3 (11th Cir. 2015). Accordingly, this objection is overruled.

Plaintiff also argues that the Report declines to follow *Mulhall v. Advance Security, Inc.*, 19 F.3d 586 (11th Cir. 1994), which Plaintiff believes requires a finding that she has established her *prima facie* EPA claim, and instead follows *Blackman*. Specifically, Plaintiff states that the Report "relies on *Blackman*'s treatment of the comparator status of subordinate employees to dispense with Plaintiff's argument that her peers—CFO Mayotte and COO Castell—are proper comparators to Plaintiff, the CHRO." Pl.'s Objs. at 6. Contrary to Plaintiff's assertion, the Report did not follow *Blackman* to the exclusion of *Mulhall*; rather, the Report cited *Blackman* as support for its conclusion that Plaintiff's opinions regarding the level of influence of Mr. Steigelfest and Mr. Viola did not create an issue of fact as to whether their jobs were substantially equal to Plaintiff's. The Report made no analysis under *Blackman* applicable to Mr. Mayotte or Mr. Castell.

In any event, the Court agrees with the Report's conclusion that *Mulhall* is distinguishable from the facts here as they relate to Mr. Mayotte and Mr. Castell. In *Mulhall*, the Eleventh Circuit

found a proper comparator because the court was "not convinced" that the skills needed in the comparator position were not substantially similar to those needed in Plaintiff's position. 19 F.3d at 594. As explained above, the Court here is convinced that the skills needed in Plaintiff's job as Chief Human Resources Officer differed materially from those required by her comparators' positions. The Court also agrees with the Report that another distinguishing factor is that in *Mulhall*, a jury could have concluded that the plaintiff's position required more effort because of the diversity of responsibilities assigned to plaintiff in relation to the comparator's "relatively homogenous job tasks." *Id*. Here, both Mr. Castell and Mr. Mayotte had more far-reaching and diverse responsibilities than did Plaintiff. Accordingly, *Mulhall* does not require finding that Plaintiff has established her *prima facie* case.

More generally, Plaintiff contends that the Report "sides with Defendants on key issues of credibility and disregards contrary evidence adduced by Plaintiff." Pl.'s Objs. at 6. The Court need not refute nor assess the significance of each fact Plaintiff asserts that the Report overlooked. The Court is satisfied that the Report did not inappropriately weigh the credibility of witnesses, nor did it disregard contrary evidence deduced by Plaintiff—with one minor exception regarding the testimony of Jacqueline Schwarting, which the Court addresses below.[3]

After conducting a *de novo* review of the evidence submitted by Plaintiff, the Court rejects Plaintiff's assertion that the testimony she submitted—in which witnesses expressed opinions of the similarity of her position to her comparators and the fairness of her compensation—was sufficient to survive summary judgment. As the Report noted, Plaintiff's own declaration claimed

---

[3] In her objections, Plaintiff repeatedly faults the Report for ignoring the testimony of Ms. Petrovsky, but the Court need not consider her testimony given its conclusion that Ms. Petrovsky's Declaration should be stricken.

that Ms. Drames told her in a private conversation before her deposition that she viewed Plaintiff's role as "comparable in terms of scope of responsibilities and effort required to the positions held by Mr. Mayotte and Mr. Castell."  PSOF ¶¶ 81, 82.  Even though Ms. Drames testified to the exact opposite during her own deposition and denied making such a statement to Plaintiff, *see* Dep. of Barbara Drames [ECF No. 93-6] at 15:4-18:4, the Report viewed the evidence in the light most favorable to Plaintiff as the non-movant and accepted Plaintiff's version of events.  Rep. at 20 n.9.[4]
Plaintiff did submit evidence from an additional witness, Ms. Schwarting, who was the Director of Talent Acquisition at Oasis and testified that the distribution of ICUs to Messrs. Castell, Mayotte, and Viola was not "fair" to Plaintiff based on her understanding of their positions, duties, and responsibilities at Oasis.  PSOF ¶¶ 66, 72.

The Court rejects Plaintiff's argument that this evidence is sufficient to withstand summary judgment under *Dimino v. Georgia Department of Administrative Services*, 631 F. App'x 745 (11th Cir. 2015).   There, the Eleventh Circuit held that the plaintiff had raised a genuine issue of material fact as to whether she offered a proper comparator:

> During the time [the comparator] worked as State Auto Insurance Program Officer, he oversaw auto liability claims, handled customer-service issues, developed programs, and supervised subrogation and indemnification. [The comparator] supervised two DOAS employees.  His program had a budget of about $10 million.  [The plaintiff] supervised six third-party contractors. Her program had a budget of about $30 million.  Chris Risley, who was the Director of the Risk Management Division, which housed [] [the comparator]'s and [the plaintiff]'s positions, thought that work done by [the comparator] and [the plaintiff] was similar, and the two should have been paid roughly the same amount.   Risley's testimony makes it at least

---

[4]  This undercuts Plaintiff's assertion that the Report impermissibly weighed credibility in favor of the Defendants.

> debatable whether [the plaintiff] and [the comparator] were engaged in
> equal work.

*Id*. at 747-48.  Unlike here, the witness in *Dimino* provided specific reasons as to why he thought

that the work done by plaintiff and her comparator was similar.  Indeed, the facts regarding their

specific responsibilities came from the supervisor's testimony.  *See* App'x, Vol. IV at 140-42, Dep.

of Chris Risley at 55:25-57:19, *Dimino v. Ga. Dep't of Admin. Servs.*, No. 15-11378 (11th Cir.

filed July 6, 2015).   In this case, bald assertions that Plaintiff's job responsibilities were

"comparable" or that Plaintiff's compensation was "unfair" do not create an issue of fact because

they are unsupported by any testimony regarding the specific duties and responsibilities of Plaintiff

and her comparators, which ultimately controls the analysis.[5]   *See Berg v. Norand Corp.,* 169 F.3d

1140, 1146 (8th Cir. 1999) (holding conclusory testimony that two jobs are equal does not establish

a *prima facie* case under the EPA where the testimony "does not explain how they are similar at

all"); *Ham v. Ga. Pub. Safety Training Ctr.*, No. 5:08–CV–384, 2010 WL 3937340, at *4 (M.D.

Ga. Sept. 30, 2010) ("In the employment discrimination context, unverifiable conjecture,

unsupported opinions, and unsubstantiated allegations of coworkers cannot suffice as viable

summary judgment evidence, especially where contradictory of highly credible and authenticated

record evidence.") (citing *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 658–59

(11th Cir. 1998); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997)).

---

[5]  Moreover, showing only that Plaintiff's position was "comparable" would not suffice to establish a valid comparator under the EPA.  *See E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254 (2nd Cir. 2014) ("From the first, the EPA concerned equal pay for—emphatically—equal work. To that end, Congress rejected statutory language encompassing 'comparable work' to instead mandate equal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'") (quoting 29 U.S.C. § 206(d)(1)).

Throughout her objections and many of the pleadings in this case, Plaintiff presents numerous arguments as to the relative importance of her role as Chief Human Resources Officer compared to the heads of other departments.  This same concept was echoed in her deposition when she testified that although the COO, CFO, and CHRO are "different roles," they are comparable in job duties and responsibilities because they all "have the same impact on the company."  Dep. of Dolores Calicchio [ECF No. 93-1] ("Calicchio Dep.") at 203:24-204:16.  She also explained that although Oasis did not have a general counsel, such a role "would be equally equivalent to a CHRO role in a sense that [the] general counsel would have a huge impact on the company in relation to legal aspects."  *Id*. at 205:13-22.  But these are "comparable worth" arguments, which contend for "increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their jobs with that of other jobs in the same organization or community."  *Cnty. of Washington v. Gunther*, 452 U.S. 161, 166 (1981).  "Whatever its merits as a theory may be, courts have held that comparable worth claims are not cognizable under either [the] Equal Pay Act or Title VII."  *Alexander v. Chattahooche Valley Comm. Coll.*, 325 F. Supp. 2d 1274, 1294 (M.D. Ala. 2004) (collecting cases).

Plaintiff's failure to establish a *prima facie* case under the EPA reflects a persistent problem faced by members of protected classes serving in high-level executive positions.  "The EPA is ill-suited for nonstandardized, high-level jobs because such positions do not, almost by definition, require equal skill, effort, and responsibility, performed under equal working conditions."  Lauri Damrell et al., *The Pay Gap, The Glass Ceiling, and Pay Bias: Moving Forward Fifty Years After the Equal Pay Act*, 29 ABA J. Lab. & Emp. L. 395, 422 (2014).  Of course, that does not mean such claims can *never* be successful—and the Court does not understand Defendants to have made

that argument here—since plaintiffs need only show substantial equality between positions and not that they are identical. *See Woodard v. Medseek, Inc.*, 178 F. Supp. 3d 1188, 1198 n.13 (N.D. Ala. 2016) ("To require that each plaintiff find an identical comparator would effectively preclude any such action by a high-ranking employee—of whom there are necessarily fewer than lower-level workers, and would restrict the remedies of the equal pay legislation to those who work at less specialized jobs, such as assembly line workers or retail clerks. Comparing substantial similarity of management skills, responsibilities, and requirements among higher-level employees is just as possible as comparing the job requirements of lower-level employees."). But given the practical realities of the high-level executive world and the fact that companies are presumably loathe to pay multiple high-level executives hefty salaries for overlapping responsibilities, EPA claims by high-level executives contain inherent difficulties, as demonstrated by the claims here.

It is perfectly reasonable to believe that Plaintiff *should* have been paid more. But because she has failed to raise a question of fact as to whether her position was substantially equal to those positions that were paid more, she cannot show that it was illegal for her to not have been paid more. Thus, she has failed to establish a *prima facie* case under the EPA.

### ii) *Factors Other Than Sex*

Even if the subjective testimony could get Plaintiff over the *prima facie* hump for Messrs. Castell, Mayotte, and Steigelfest,[6] Plaintiff would still be required to show that Defendants' proffered explanation for the pay differential is pretextual. As explained above, the EPA provides four affirmative defenses, and Defendants here rely on the EPA's "catch-call" defense, which

---

[6] Notably, the evidence regarding the opinions of Ms. Drames and Ms. Schwarting lacks any mention of Mr. Steigelfest, so he is not a valid comparator for this additional reason.

allows Defendants to show that the differential was "based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv). This exception can apply when "the disparity results from unique characteristics of the same job, from an individual's experience, training, or ability, or from special exigent circumstances connected with the business." *Mulhall*, 19 F.3d at 596. With these standards in mind, Defendants provide justifications for each of the three possible comparators that Plaintiff fails to rebut.

As to Mr. Castell, Defendants submit that among the factors motivating his compensation were the scope of his job responsibilities and the compensation Castell was giving up by leaving his prior employer. MSJ at 11. Although Plaintiff argues that prior salary is not a valid "factor other than sex," the Eleventh Circuit has held only that prior salary *alone* cannot satisfy this affirmative defense. *Irby*, 44 F.3d at 956 ("While an employer may not overcome the burden of proof on the affirmative defense of relying on 'any other factor other than sex' by resting on prior pay alone, as the district court correctly found, there is no prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay *and* more experience.") (emphasis in original). When Mr. Castell was hired by Oasis, he had been employed by his then-current employer for over fifteen years and forfeited already-existing rights to restricted stock of his former employer worth about $200,000. Decl. of J. Kelley Castell [ECF No. 107-1] ¶¶ 3-4. By contrast, when she was hired by Oasis, Plaintiff had been employed by her employer less than two years, and her departure resulted in her not receiving a bonus from her former employer of $100,000. [ECF Nos. 92-2, 92-4]; PSOF ¶ 111.

It is undisputed that Mr. Perlberg was the ultimate authority regarding executive compensation, PSOF ¶ 9, and he testified that in addition to the differences in their prior salaries,

Mr. Castell's authority over multiple aspects of the organization—including marketing, operations, client service, and information technology—was a reason he received more in compensation than Plaintiff.  Dep. of Mark Perlberg [ECF No. 100-6] ("Perlberg Dep.") at 119:14-120:24.  Assuming Plaintiff had made her *prima facie* case, the differing breadth of the portfolios of the two jobs is a "unique characteristic[]" of the same job, *Mulhall*, 19 F.3d at 596, that falls within the catchall affirmative defense.  *See Lima v. Fla. Dep't of Children and Families*, No. 8:13-cv-1809, 2014 WL 11352891, at *6 (M.D. Fla. Nov. 13, 2014) ("Plaintiff . . . has [not] advanced evidence tending to show that Defendants' proffered explanation for the pay differential, [the comparator's] broader range of responsibilities[,] . . . is simply pretext or a post-event justification for the pay differential."), *aff'd*, 627 F. App'x 782 (11th Cir. 2015); *Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349, 1363 (M.D. Ga. 2009) (finding that defendant had adequately invoked the catchall affirmative defense where the pay decision was motivated in part by "the complexity, difficulty, and scope of the job").

While Plaintiff takes issue with the fact that Mr. Perlberg decided what the executives were paid, "[s]o long as subjective business justifications, not part of a merit system, are not overly subjective so as to render them incapable of being rebutted, they are legitimate factors to be considered." *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991).  Defendants' justification was not too subjective to be rebutted; for example, Plaintiff could have adduced evidence showing that like Mr. Castell, she too had authority over the many different facets of Oasis's business.  But instead, the record evidence supports that the breadth of Mr. Castell's portfolio was unique to his position.

As to Mr. Mayotte, Defendants assert that Mr. Mayotte's experience and many years of service to the company were the principal motivating factors for his compensation.  Mr. Mayotte co-founded Oasis and served as its Chief Financial Officer for two decades before Plaintiff was hired.  DSOF ¶ 2; Decl. of Terry Mayotte [ECF No. 93-9].  Mr. Perlberg testified that this was a crucial justification for his compensation.  Perlberg Dep. at 71:12-22; 112:8-113:6; 115:6-13; 118:9-119:13.  He also testified that from a financial standpoint, PEOs like Oasis are very difficult to run and scale—particularly the balance sheet, benefit strategies, workers compensation strategies and programs, the management and strategies of unemployment insurance programs, and overall P&L management—and Mayotte was especially skilled in that regard.  *Id*. at 115:14-116:5.

These are valid reasons "other than sex" justifying his compensation.  Plaintiff insists his experience cannot justify his compensation because there was no formal seniority policy in place and therefore this justification is too subjective.  MSJ Resp. at 15.  But the Eleventh Circuit has made clear that "[f]or experience to be a legitimate 'any other factor other than sex' affirmative defense[,] it need not rise to the level of an established seniority system."  *Irby*, 44 F.3d at 956 n.10 (citing *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)).  And "the defense of experience [] is capable of being rebutted" because "the plaintiff could show that he or she had equal or more experience of the same type."  *Id*. at 956.  While Plaintiff insists she had similar experience because she was responsible for payroll, it is undisputed that she did not serve at Oasis for nearly as long as Mr. Mayotte nor did she have as specialized experience in the many different aspects of Oasis's finances.  *Id*. ("Time spent in a position equates with experience in the division;

to gain experience one must necessarily spend time in an activity. Time is a measurable quantity one can sufficiently rebut.").

The same is true for Mr. Viola.  He joined Oasis in 1996, the company's first year in operation, which was over twenty years before Plaintiff joined the company.  Decl. of Terry Mayotte [ECF No. 93-9] ¶ 3.  He was therefore viewed as a co-founder of Oasis.  *Id.*; *see also* [ECF No. 107-6].  Moreover, as Plaintiff states, Mr. Viola's job responsibilities centered on driving external sales to clients, a "unique characteristic" of Mr. Viola's job when compared to Plaintiff's that would have justified the discrepancy in pay.

In sum, Plaintiff has not established her *prima facie* case under the EPA because she has failed to establish that the skills, duties, and responsibilities required by her position were substantially equal to that of her proffered comparators.  Even if she could demonstrate the validity of her comparators through subjective testimony, she is unable to rebut the legitimate "factors other than sex" that justified the discrepancy in pay. Although she claims Defendants' justifications for the compensation decisions must be pretextual because they were not applied equally to her, the record evidence does not support that assertion.  Summary judgment will be granted to Defendants on Plaintiff's EPA claims in Counts I through VII of her Second Amended Complaint.

**B.   The Title VII Claims**

Plaintiff's Title VII claims in Counts VIII and IX of her Second Amended Complaint allege that Defendants discriminated against her on the basis of her sex by terminating her employment, denying her opportunities for further employment following Paychex's acquisition of Oasis, and by paying her less in salary on the basis of her sex.  SAC ¶¶ 91-109.  Title VII prohibits intentional

discrimination against an employee "because of," among other things, sex.  42 U.S.C. § 2000e-2(a)(1).  For the purposes of Plaintiff's discrimination claims, Title VII differs from the EPA in that she must also prove discriminatory intent.  *Mulhall*, 19 F.3d at 597.

In cases such as these where there is no direct evidence of discrimination, there are two principal ways in which a plaintiff may establish such intent through circumstantial evidence.  The first, and most common, is by using the burden-shifting framework under *McDonnell Douglas*.  *See, e.g.*, *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973)).  As explained by the Eleventh Circuit in *Lewis*:

> When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably.  If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination.

*Id*. (internal citations and quotations omitted).

If the *McDonnell Douglas* path is foreclosed, a plaintiff may nevertheless survive summary judgment if she can "present circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Johnson*, 2021 WL 2134862, at *6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  Under the *Smith* framework, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by

the decisionmaker." *Id.* (alterations omitted).  A plaintiff may establish a "convincing mosaic" by pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly-situated employees, and (3) pretext.  *Lewis*, 934 F.3d at 1185.

In Counts X-XI of the Second Amended Complaint, Plaintiff contends that Defendants unlawfully retaliated against her for engaging in protected activity by "refusing to consider her for positions post-acquisition and terminating her employment."  SAC ¶¶ 110-122.  Employers may not retaliate against an employee for complaining about sex discrimination in the workplace.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . .").  "A claim for retaliation under Title VII that relies on circumstantial evidence, such as this one, follows the same *McDonnell Douglas* burden-shifting analysis that applies to Title VII discrimination cases."  *Clark v. Bd. of Regents of Univ. Sys. of Ga.*, 243 F. Supp. 3d 1367, 1375 (S.D. Ga. 2017) (citing *Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010)); *see also Velasquez v. Cardinal Health 414 LLC*, No. 20-60402, 2021 WL 2905369, at *6 (S.D. Fla. Apr. 17, 2021) ("As Plaintiff has not argued that any direct evidence of retaliatory animus or any convincing mosaic of circumstantial evidence exists, and instead relies generally on circumstantial evidence (primarily alleged temporal proximity), the burden-shifting framework from *McDonnell Douglas . . .* applies in analyzing Plaintiff's retaliation claim."), *report and recommendation adopted*, 2021 WL 2493087 (S.D. Fla. June 18, 2021).

Pursuant to that framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that: (1) she engaged in statutorily protected conduct (i.e., conduct protected by Title VII); (2) she suffered an adverse action; and (3) "there is some causal relationship between the two events." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). "The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action. Assuming the employer's burden is met, the burden shifts back to the plaintiff to establish that the reason offered by the employer was not the real basis for the decision, but a pretext for retaliation." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021) (internal citations and quotations omitted).

### i) Discrimination

#### a. Termination

Before the Court can address the merits of Plaintiff's Title VII claims that stem from her termination, it must address Plaintiff's objection to the Report's conclusion that these claims are time-barred.  A plaintiff seeking to bring a civil action for employment discrimination under Title VII must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *Stamper v. Duval Cty. Sch. Bd.*, 863 F.3d 1336, 1340 (11th Cir. 2017).  In a "deferral state" like Florida,[7] the charge must be filed within 300 days "of the last discriminatory act." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002) (citing 42 U.S.C. § 2000e-5(e)(1)).  In other words, "only those claims arising within 300 days prior to the filing of

---

[7]  "Deferral states are those that prohibit the unlawful employment practice at issue and have established state or local authorities to grant or seek relief for such practice." *Maynard v. Pneumatic Prod. Corp.*, 256 F.3d 1259, 1262-63 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(1)); *see also, e.g., Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129, 1142 (M.D. Fla. 2016) (recognizing Florida is a deferral state).

the EEOC's discrimination charge are actionable." *Id.* (citations omitted).  Discrete discriminatory acts, such as termination, which are "easy to identify" and therefore "constitute a separate actionable unlawful employment practice," are not actionable if time-barred.  *Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) (quoting *National R.R. Passenger Corp.*, 536 U.S. 101, 113-114 (2002)).  The Eleventh Circuit has consistently held that "an adverse employment action is deemed to have occurred when the employer made the final decision and communicated it to the employee."  *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) (citing *Del. St. Coll. v. Ricks*, 449 U.S. 250, 258, 261–62 (1980)).

The preceding paragraph is a fancy way to say that Plaintiff had to file an EEOC charge within 300 days of whatever employment action she felt was discriminatory or retaliatory—or else forfeit her Title VII claims.  Plaintiff filed her EEOC charge for discrimination and retaliation on November 7, 2019, SAC ¶ 15, so if the actions she is complaining about occurred more than 300 days earlier (in other words, prior to January 11), then her claims are untimely.  Defendants argued—and the Report agreed—that the Title VII claims stemming from her termination (so both the discrimination and retaliation claims) are time-barred because Plaintiff met with Mr. Perlberg on January 4, 2019 and was told unequivocally that her employment would be ending.  The Court agrees that is what happened on January 4, 2019, but the Report erred in not considering the effect of subsequent events on the 300-day filing period.

The charge filing period does not run until the employee receives "unequivocal notice of the adverse employment action."  *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996).  Therefore, if Plaintiff received unequivocal notice in her January 4 meeting with Mr. Perlberg that she was going to be terminated, then that is when the clock started to run on her

claims relating to that termination.[8]   Unsurprisingly, then, Defendants argue that is exactly what happened.   But Plaintiff insists she was told "that her employment was projected to end in March *unless she found another position* at Paychex."   PSOF ¶ 178 (emphasis added).   This distinction matters because the "charge filing period does not run until the plaintiff is told that she is actually being terminated, not that she *might* be terminated *if* future contingencies occur."   *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000) (emphases in original).

The record shows that Plaintiff was told unequivocally that she would be terminated on January 4, 2019.[9]   Therefore, the clock started to run on her Title VII claims relating to her termination on that day.   But there is a difference between determining when the clock starts (by the communication of the adverse employment decision) and determining if the clock ever stops (by equitable tolling).   "[W]hile the employer is actively trying to find a position within the

---

[8]   Although Plaintiff makes much of the fact that her final day was pushed back multiple times, this is irrelevant so long as it had been decided that she was going to be terminated.   *See Del. St. Coll. v. Ricks*, 449 U.S. 250, 257 (1980) ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.").

[9]   Plaintiff's version of events relies on her declaration, PSOF ¶ 178, but that declaration directly contradicts her prior deposition testimony that she was told explicitly on January 4 that "she would not have a role with Paychex." Calicchio Dep. at 150:4-6; *see also id.* at 126:20-22; 135:7-11150:132:11-15.   "A court may disregard . . . an affidavit or declaration 'submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.'"   *Buckley v. Charter Commc'ns, Inc.*, No. 8:19-cv-2029, 2021 WL 1250772, at *1 (M.D. Fla. Apr. 5, 2021) (quoting *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003)).   Although this rule does not apply to "every failure of memory or variation in a witness's testimony[,]" *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986),"[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with a [declaration] that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984).   Nor does Plaintiff's version of events make sense given that Plaintiff testified that the January 4 meeting came after repeated attempts on her part to get Mr. Perlberg to ascertain whether there would be a role for her at Paychex. Calicchio Dep. at 129:7-131:25.

company for the employee, the filing period is equitably tolled until such time as it is or should be apparent to an employee with a reasonably prudent regard for his rights that the employer has ceased to actively pursue such a position." *Pearson v. Macon-Bibb Cnty. Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir. 1992) (quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561-62 (11th Cir. 1987)). This rule prevents employers from increasing their chances of escaping the 300-day window unscathed by dangling the carrot of other employment opportunities in front of employees. *See id.* ("It is too much for the law to expect an employee to sue his employer for [sex] discrimination [or retaliation] at the same time he is led to believe the employer is trying to place him in another job."). The "relevant question" is "whether she reasonably believed at the time . . . that she would be favorably [accommodated] so as to obviate any discrimination [or retaliation] charge." *Id.* at 1280 n.1.

The undisputed facts show that on February 18, 2019, Kim Kelly, the Director of Talent Acquisition at Paychex, contacted Plaintiff to see if she would be interested in discussing the position of HR Services Region Manager. DSOF ¶ 54. Plaintiff then corresponded with Paychex representatives until February 27, 2019, which is when Plaintiff informed Paychex that the role did not meet her salary expectations and she would not be pursuing it any further. *Id.*; [ECF No. 92-20]. Because Defendants had reached out to Plaintiff about an employment opportunity, a rational juror could conclude that she reasonably believed for those nine days that she would continue with Paychex and thus obviate the need for any legal claim relating to her termination from Oasis. Thus, the 300-day clock was stopped for at least those nine days. And because those nine days exceed the seven days by which Plaintiff's EEOC charge missed the 300-day deadline, her Title VII claims relating to her termination are not time-barred.

However, despite the timeliness of her claims, Plaintiff has failed to establish that her termination was due to her sex in violation of Title VII. To establish a *prima facie* case of wrongful termination based on discrimination, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) her employer treated "similarly situated" employees outside her class more favorably. *Cooper v. Ga. Dep't of Transp.*, 837 F. App'x 657, 667 (11th Cir. 2020). To satisfy the fourth element, a plaintiff "must show that she . . . was replaced by someone outside the protected class." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). To the extent Plaintiff was "replaced," it was by Laurie Zaucha, the highest-ranking human resources official at Paychex, who Plaintiff admits had a role that duplicated hers. DSOF ¶ 42. Because Ms. Zaucha is a woman and thus a member of Plaintiff's protected class, Plaintiff cannot establish a *prima facie* case for discriminatory discharge. And even if she could, she would not be able to show that Defendants' proffered reason for terminating her employment—the acquisition by Paychex and the need to avoid duplication of efforts—was pretext.

### b. Opportunities for Future Employment

The Report found that Plaintiff's Title VII discrimination claim based on Defendants denying her opportunities for further employment following Paychex's acquisition of Oasis fails because she cannot demonstrate that similarly situated individuals outside of her protected class were treated more favorably. Rep. at 40. Plaintiff does not object to this finding, and reviewing it for clear error, the Court agrees. Even if she could establish that Mr. Castell and Mr. Viola were similarly situated to her, it is undisputed that they were also terminated as a result of Paychex's acquisition of Oasis, and there is no record evidence suggesting that they were considered for other

employment opportunities with Paychex.  Moreover, the Paychex job Plaintiff wanted, Director of PEO Centralized Services, was given to Ms. Tate, who is a member of her protected class. Therefore, the Report correctly found that Plaintiff has not met her burden of establishing a *prima facie* case for her Title VII discrimination claim based on Defendants denying her opportunities for future employment.

    c.  Gender Pay Discrimination

The Report found that Plaintiff's claim for discriminatory compensation "fails to establish a *prima facie* case under Title VII for the same reason as her failure under the EPA: Her comparators were not similarly situated to her."  Rep. at 40 (quoting *Garcia v. Univ. of Miami*, No. 12-20009, 2012 WL 12845123, at *8 (S.D. Fla. Dec. 20, 2012)).  Plaintiff objects that the Report "ignores Eleventh Circuit precedent with respect to Title VII's 'more relaxed' standard." Pl.'s Objs. at 13.  The Court is unconvinced.

     It is true that the burden of showing the similarity of work performed by a female plaintiff and a male comparator is "more relaxed" under Title VII than under the EPA.  *Rollins v. Ala. Comm. Coll. Sys.*, 814 F. Supp. 2d 1250, 1267 (M.D. Ala. 2011); *see also Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 151, 1526-27 (11th Cir. 1992).  Thus, Plaintiff is correct that she need not establish a valid comparator under the EPA to assert a *prima facie* case under Title VII. But Plaintiff does not attempt to explain *how* she meets the Title VII standard, choosing instead to assert only that the Report got it wrong.

    The Eleventh Circuit recently clarified that under Title VII, a plaintiff must demonstrate that she and her proffered comparators are "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1218. "[A] valid comparison will turn not on formal labels, but rather on substantive

likenesses." *Id*. And critical to the analysis here, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id*. at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). Moreover, the court specifically noted that "[o]rdinarily, . . . a similarly situated comparator . . . will share the plaintiff's employment [] history." *Id*. (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016)); *see also Heatherly v. Univ. of Ala. Bd. of Trustees*, No. 7:16-cv-00275, 2018 WL 3439341, at *16 (N.D. Ala. July 17, 2018) ("When determining whether an individual is a proper comparator, courts examine the amount of years an individual has worked for the employer, the type of expertise the individual has, and the supervisor of the alleged comparator versus that of the plaintiff, among other factors.") (citations omitted), *aff'd*, 778 F. App'x 690 (11th Cir. 2019).

Mr. Mayotte and Mr. Viola had both served at Oasis for over twenty years before Plaintiff came to Oasis, a difference in employment history that alone prevents them from being "similarly situated" to Plaintiff. *See Lewis*, 918 F.3d at 1228*; Etheridge v. Bd. of Trustees of Univ. of W. Ala.*, No. 7:18-CV-00905, 2020 WL 4260598, at *10 (N.D. Ala. July 24, 2020) (finding that although plaintiff and her proffered comparator had the same position, they were not similarly situated under Title VII because her comparator had been in the job 27 years while she had been in the job less than five years). Moreover, because of the significant differences between Plaintiff's job and those of each of her comparators, which required different areas of expertise, she has failed to demonstrate that her comparators are similarly situated in all material respects. *See Alexander*, 325 F. Supp. 2d at 129 ("Although there is a relaxed standard of similarity . . . in a Title VII pay discrimination analysis, [plaintiff] cannot meet that lighter standard . . . [because] her job is simply

too different from the other director jobs to which she compares it for her to be able to show that the jobs are even substantially similar.") (internal citation omitted).

Even if she could establish a *prima facie* case under Title VII, she would not be able to overcome Defendants' legitimate nondiscriminatory reasons for the pay differential. "The affirmative defenses of the EPA have been incorporated into Title VII." *Reddy v. Dep't of Educ., Ala.*, 808 F. App'x 803, 811 (11th Cir. 2020) (citing *Gunther*, 452 U.S. at 176).   "This incorporation allows employers to defend against charges of discrimination under Title VII where the evidence establishes that their pay differentials are based on a *bona fide* use of 'other factors other than sex.'"   *Prewett v. Ala. Dep't of Veterans Aff.*, 533 F. Supp. 2d 1160, 1185-86 (M.D. Ala. Dec. 27, 2007) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 198-201 (1974)) (emphasis in original).   As explained above, Defendants have adequately invoked this EPA affirmative defense at least as to Messrs. Mayotte, Castell, and Steigelfest.  Because "Defendants have established as a matter of law one of the EPA affirmative defenses, that defense is also dispositive of any Title VII claims based upon the same underlying facts."  *Id.*

Plaintiff also objects that the Report "ignores other evidence of discrimination."  Pl.'s Objs. at 14.  She argues that she has submitted enough circumstantial evidence to infer discrimination on the part of Defendants, invoking (without explicitly saying so) the "mosaic" theory of discrimination mentioned above.  *Id*.  The Court disagrees.  Most of the evidence she cites in this regard comes from the Declaration of Ms. Petrovksy, which the Court has already ruled will not be considered.  She also offers the fact that Oasis hired a law firm to evaluate a potential gender pay gap, but the deposition testimony Plaintiff cites from Ms. Schwarting states that the firm was retained to provide "an update of things [they] were doing in the organization."  Dep. of Jacqueline

Schwarting [ECF No. 93-2] ("Schwarting Dep.") at 59:14-25.  No evidence was provided as to what that firm found, and it would make little sense to penalize a corporation for merely retaining a law firm to evaluate potential gender pay disparities without regard to whether they are shown to exist.  Finally, Plaintiff offers Ms. Schwarting's testimony that other women at Oasis were paid less than men performing equal work.  Viewing the evidence in the light most favorable to Plaintiff, the Court credits her testimony as true, but her confirmation that there were "at least some women" who were paid less than men for equal work, Schwarting Dep. at 60:20-24,[10] would not allow a jury to infer "systematically better treatment of similarly situated employees." *Lewis*, 934 F.3d at 1185.  And even considered in conjunction with the rest of the record, it is insufficient to create a convincing mosaic because it does not raise an inference that Defendants were purposefully discriminating to obtain such a result.  *See Forbes v. Wal-Mart Stores, Inc.*, No. 17-81225, 2019 WL 3859010, at *9 (S.D. Fla. Aug. 16, 2019) (finding that plaintiffs' evidence that women were paid less than men in many positions might have shown "some discriminatory actions within the company," but did not establish "a plausible mosaic, never mind a convincing one, regarding [the] claims of intentional discrimination.") (citing *Chin v. Port Auth. of N.Y. & N.J*, 685 F.3d 135, 149 (2d Cir. 2012)).

　　For these reasons, Defendants are entitled to summary judgment on Counts VIII and IX of the Second Amended Complaint.

---

[10]  To be sure, Ms. Schwarting gave four examples of women she felt were compensated less than men for equal work.  Schwarting Dep. at 61:1-25.  Nevertheless, this falls short of the evidence necessary to infer *systematically* better treatment of men over women.

### ii)  Retaliation

The Court declines to adopt the Report's conclusion that a genuine dispute of material fact exists as to Plaintiff's retaliation claims.

The Court begins by clarifying the parameters of these claims.  In Counts X and XI of the Second Amended Complaint, Plaintiff contends that because she engaged in protected activity— i.e., raising with Mr. Perlberg her belief that she had been discriminated by being paid less due to her sex—Defendants retaliated against her by "refusing to consider her for positions post-acquisition and terminating her employment."  SAC ¶¶ 111, 119.  The Report relies on Mr. Perlberg's exclusion of Plaintiff from team meetings and dinners as one of the relevant adverse employment actions, Rep. at 12 n.2, and Defendants object that this was improper because these adverse employment actions were not pleaded in the Second Amended Complaint,  Objs. to Rep. and Recommendation by Defs. [ECF No.129] ("Defs.' Objs.") at 14.  The Court agrees and finds that Plaintiff is limited to the retaliatory conduct alleged in the operative complaint.

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Applying the requirements of Rule 8(a) to the instant case, it is clear that the allegations regarding the exclusion of Plaintiff from meetings and dinners are nowhere to be found in Plaintiff's Second Amended Complaint.  To the extent that Plaintiff sought to amend her retaliation claim through her response brief, this is not permitted.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  "Because [Plaintiff] never amended her complaint to include a claim for retaliation based on her [exclusion from meetings and dinners], that claim is not properly pled and the Court

will not consider it." *Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1289 (M.D. Ala. 2011) (citing *Thampi v. Manatee Cnty. Bd. of Comm'rs*, 384 F. App'x 983, 988 (11th Cir. 2010)).

Although Plaintiff argues that Defendants were on notice of these allegations because Plaintiff discussed them in her deposition, "the discussion of a potential claim in a deposition does not satisfy the requirement of Rule 8(a)." *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (finding that "[t]he district court correctly refused to address this allegation of retaliation."); *see also Powell v. O'Neal Steel, Inc.*, No. CV-08-BE-1024-S, 2010 WL 11561370, at *7 (N.D. Ala. Mar. 31, 2010) ("The First Amended Complaint specifies three adverse actions that affected Powell, and the newly-asserted adverse actions are not included. To the extent that Plaintiff assumes his deposition testimony somehow placed those claims before the court, he is wrong; the requirements of Rule 8(a) require that he state those claims in his pleadings."). Nor is Plaintiff correct that she may alter the theory of her retaliation claim so long as she asserted the proper statutory basis for the claim in her complaint. *See, e.g.*, *Jackson v. Curry*, No. 08-05207, 2013 WL 5366982, at *3 (N.D. Cal. Sept. 25, 2013) (rejecting plaintiff's attempt to assert a different theory of first amendment retaliation that was not alleged in the complaint); *accord Wu v. Thomas*, 996 F.2d 271, 275 (11th Cir. 1993) (affirming district court's refusal to allow testimony about an additional reason defendants retaliated against plaintiffs because it was "irrelevant to anything pled in the complaint.").

While Plaintiff contends that this point is much ado about nothing because she only needed to plead one adverse employment action, it matters because Defendants are required to provide legitimate, nonretaliatory reasons for each adverse employment action and Plaintiff must show

that such reasons are pretextual. Thus, because there are different justifications for different employment actions, parties must be made aware of the precise nature of the alleged retaliation. The Court addresses the two adverse employment actions alleged in the Second Amended Complaint: termination of Plaintiff's employment and the refusal to consider her for positions post-employment.

### a.   Termination

For the reasons explained above, Plaintiff's claims for retaliatory discharge are not time-barred. Nevertheless, she has failed to raise a dispute of material fact as to these claims. "Acts which precede protected activity cannot logically form the basis of causation of an adverse action." *Cormack v. N. Broward Hosp. Dist.*, No. 08-61367, 2009 WL 2731274, at *6 (S.D. Fla. Aug. 26, 2009); *see also Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 968 (11th Cir. 2017). Plaintiff testified that Mr. Perlberg informed her that her employment was being terminated *before* she raised the issue of a perceived gender pay disparity. Calicchio Dep. at 141:6-21. Therefore, Plaintiff's claim for retaliatory termination necessarily fails.

### b.   Opportunities for Future Employment

Just because Plaintiff's underlying claims for gender pay discrimination fail does not necessarily mean the same for her retaliation claims. *See generally Howard v. Walgreen Co.*, 605 F.3d 1239, 1244-45 (11th Cir. 2010) (explaining that a plaintiff must show both that she subjectively believed that her employer engaged in unlawful discrimination and that the belief was objectively reasonable in light of the facts and record present, although she "need not prove that the conduct [s]he opposed was actually unlawful"). Because Defendants do not dispute that

Plaintiff engaged in protected activity of which they are aware by raising the gender pay dispute with Mr. Perlberg, the Court proceeds to the merits of her retaliation claim.[11]

Defendants object that the Report applied the incorrect legal standard of causation by analyzing only "whether the protected activity and the negative employment action are not completely unrelated." Rep. at 42 (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008)). Defendants argue that the Report should have applied the but-for causation standard. Defs.' Objs. at 5. However, that standard is only appropriate at the pretext stage of the inquiry—a stage the Report never reached. The "not completely unrelated" standard was all that was required at the *prima facie* stage. As the Eleventh Circuit recently explained:

> Both at the *prima facie* stage and at the stage of analysis after which the defendant has articulated a legitimate, nonretaliatory reasons for its action, the plaintiff is called on to show that the evidence demonstrates the requisite causal connection. As for the causation prong of the *prima facie* test, the plaintiff must show "that the protected activity and the adverse action were not wholly unrelated." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) (quoting *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277–78 (11th Cir. 2008)). A plaintiff can

---

[11] Plaintiff believes the Report erred because it "concludes that Plaintiff has adduced sufficient evidence of the underlying violations in order to meet the good faith element of her retaliation claims, but that somehow that same evidence is insufficient to raise an issue of fact as to whether those underlying violations actually occurred." Pl.'s Objs. at 3. This is misguided on both the law and the facts. Legally, the objective and subjective good faith requirement only goes to whether Plaintiff engaged in protected activity under the statute. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) ("*To establish that a plaintiff engaged in statutorily protected expression*, we have held that a plaintiff must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.") (citation and internal quotations omitted) (emphasis added). Because the Report acknowledged that Defendants did not dispute whether Plaintiff had engaged in protected activity, it had no occasion to reach the question of the objective basis of Plaintiff's belief that she had been the victim of discrimination. And even if it had, its conclusion that Plaintiff did not produce sufficient evidence of the underlying violations would not necessarily preclude a finding that she had met the good faith requirement for her retaliation claims. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) ("A plaintiff [] need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement '[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances.'") (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)).

establish a *prima facie* causal link "by showing close temporal proximity between the statutorily protected activity and the adverse . . . action." *Thomas v. Cooper Lighting,* Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). It is true that "mere temporal proximity, without more, must be very close." *Id.* (internal quotation marks omitted).  At the stage of summary judgment proceedings in which the plaintiff must rebut the defendant's proffered nonretaliatory reason for its action, however, the plaintiff must meet the more demanding "but for" test.  Specifically, citing *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 186 L.Ed.2d 503 (2013), *Gogel* noted that the Supreme Court had held that the "but for" test is to be applied in determining whether a plaintiff has ultimately shown the requisite causal connection for a Title VII retaliation claim.  *Gogel*, 967 F.3d at 1135 n.13.  That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action.  Further explaining that we have "integrated this but-for standard into our summary judgment analysis," the *Gogel* court applied this standard at the pretext stage of its inquiry. *Id.*

*Tolar*, 997 F.3d at 1294.

Applying these standards, the Court agrees with the Report that Plaintiff adequately set forth a *prima facie* claim of retaliation—but rejects the Report's conclusion that Defendants did not meet their burden of providing a legitimate, nonretaliatory reason for their employment decisions.  And because Plaintiff fails to directly rebut Defendants' reason, summary judgment is due to be granted to Defendants on her retaliation claims.

The undisputed facts show that Mr. Perlberg responded to Plaintiff's allegations of a pay disparity by saying "you're spooking me," and then treating her differently and eliminating her from meetings and team dinners.  Just a short time later, Paychex filled its role of Director of PEO Centralized Services and did not consider Plaintiff for the position.  This came after Mr. Perlberg—a chief decisionmaker who exhibited influence over who Paychex would hire for certain positions—recommended Ms. Tate for the role and not Plaintiff.  It is undisputed that he knew of Ms. Calicchio's protected activity because he was the recipient of her initial complaint on January

4, 2019, and he also informed Paychex representatives of Plaintiff's complaint, who did not investigate the situation. Mr. Perlberg's negative treatment of Ms. Calicchio after she complained to him, and his ambiguous statement that she was "spooking" him, suggest a retaliatory intent. Along with the close temporal proximity of these events to the relevant employment decision, all of which occurred in January of 2019, this is sufficient to find that the two are not wholly unrelated and thus clear the *prima facie* hurdle.

However, Defendants have met their burden of articulating a legitimate, nonretaliatory reason for the decision not to consider Plaintiff for the role of Director of PEO Centralized Services. The Report found that "Mr. Perlberg offered only cursory testimony regarding his 'understanding' that Ms. Tate was 'better suited' for the Director position" than Plaintiff and that "Defendants fail[ed] to offer any explanation for Mr. Perlberg's exclusion of [Plaintiff] from meetings, his refusal to recommend her for any position at Paychex, and Paychex's decision not to investigate [Plaintiff]'s claims." Rep. at 44. The Report erred by imposing too heavy of a burden at this stage of the inquiry.

"The employer's initial showing, just as the plaintiff's, is a low bar to hurdle." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). "This burden involves no credibility determination, and has been characterized as 'exceedingly light.'" *Fail*, 2018 WL 3495862, at *3 (quoting *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983) and citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "As long as the employer articulates 'a clear and reasonably specific' non-[retaliatory] basis for its actions, it has discharged its burden of production." *Id.* (quoting *Tex. Dep't of Community Aff. v. Burdine*, 450 U.S. 248, 254-55 (1981)).

The legitimate nonretaliatory reason Defendants provided for their decision not to consider Plaintiff for the role of Director of PEO Centralized Services was that they viewed the role as a business operations position and viewed Plaintiff's skills and experience as being limited to human resources.  Mr. Perlberg testified to such at his deposition, Perlberg Dep. at 140:8-141:1, as did Ms. Zaucha, the head of human resources for Paychex, Dep. of Laurie Zaucha [ECF No. 93-4] ("Zaucha Dep.") at 35:6-36:17.  This was a clear and reasonably specific nonretaliatory basis for its actions, so the burden shifted back to Plaintiff to demonstrate pretext.  And this she fails to do.

"The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  It follows that "[t]he question to be resolved is not the wisdom or accuracy" of Defendants' decision to not consider Plaintiff for the role she sought, or whether that decision was "prudent or fair." *Id*. (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).  Instead, the Court's sole concern "is whether unlawful [retaliatory] animus motivate[d]" the decision. *Id*.  "If the employer's reason is 'one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" *Dugandzic v. Nike, Inc.*, 807 F. App'x 971, 976 (11th Cir. 2020) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)); *see also Gogel*, 967 F.3d at 1136 (noting that the Eleventh Circuit has "repeatedly emphasized" this point) (collecting cases).  "Plaintiff may demonstrate that [Defendants'] reasons were pretextual by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of

credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation and quotation omitted). "A reason is not pretext for retaliation unless it is shown *both* that the reason was false, *and* that retaliation was the real reason." *Gogel*, 967 F.3d at 1136 (alteration and internal quotations omitted) (emphases in original).

Plaintiff has failed to directly rebut Defendants' evidence that she was not considered for the role she sought because it was viewed by Defendants as a business operations position—a client-facing job that worked directly with PEO service customers and the Paychex sales force in the field. DSOF ¶ 53. The record shows that the position at issue, Director of PEO Centralized Services, reported to Lisa Sowerby (then the Senior Director of PEO Service for Paychex) and was the head role for payroll and relationship management for Paychex and its clients. DSOF ¶¶ 51, 53. The position did not report to the human resources department or any official therein. When announcing the position, Paychex described it as being part of the operations division. [ECF No. 92-14].

Meanwhile, the unrebutted evidence also shows that Plaintiff's experience was considered by Defendants to be confined to human resources. Perlberg Dep. at 140:8-141:1; Zaucha Dep. at 35:6-36:17. Indeed, Plaintiff informed Defendants that she was "interested in . . . continuing in a meaningful capacity *within Human Resources* at Paychex if that was a possibility." [ECF No. 92-20] at 5 (emphasis added). Perhaps most importantly, Plaintiff *was* considered for another role within Paychex post-acquisition that was within their human resources department. DSOF ¶ 54. Defendants reached out to Plaintiff to gauge her interest in the role before learning that the salary did not meet her expectations, but there is no indication in the record that Defendants knew that Plaintiff would not be amenable to that salary. If Defendants' true motive for not considering

Plaintiff for the role was retaliatory, it stands to reason that they would not consider her for other jobs. And Plaintiff was able to produce no evidence that Defendants were aware that she was at all interested in the position of Director of PEO Centralized Services.[12] In effect, Plaintiff asks the Court to speculate that Defendants were aware or should have been aware that Plaintiff was interested in that role, and in an attempt to retaliate against her, Defendants considered her for the human resources position but not the role she really wanted. Since the evidence does not support such an inference, the Court will not indulge such speculation.

In addition, although Plaintiff argues otherwise, the evidence shows Defendants only considered one candidate, Ms. Tate, for the position Plaintiff sought.[13] DSOF ¶ 51. In October 2018, Paychex determined that one of the Oasis employees that would be offered a role at Paychex was Ms. Tate. DSOF ¶ 49. Although Paychex was not initially certain what position that would be, it aligned Ms. Tate's position at Oasis with a role at Paychex as part of a process known as "mapping." DSOF ¶ 51. That led to the hiring of Ms. Tate for the position of Director of PEO Centralized Services, a role similar to the role Tate held at Oasis albeit on a smaller scale. *Id*. While Plaintiff insists she was just as qualified, if not more, than Ms. Tate for the position, "[i]t is

---

[12] Plaintiff insists that Ms. Zaucha *did* know she was interested in the job she sought. PSOF ¶ 51. The only evidence she offers in support of this point is her own deposition testimony that Zaucha was aware of her interest because she had "been asking for months if there would be an opportunity for me within Paychex where my skill sets would be utilized." Calicchio Dep. at 151:14-152:4. But this does not support the assertion that Defendants *actually knew* of her interest in the role, and Zaucha testified that she did not know of such interest. Zaucha Dep. at 36:10-16. That Plaintiff believes she *should* have been considered qualified for the role is immaterial. *See Cotton v. Enmarket Inc.*, 809 F. App'x 723, 726 (11th Cir. 2020) ("An employee's opinion about his own qualifications [is] insufficient to create a triable issue of fact") (citing *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000)); *see also Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (explaining that "conclusory allegations without specific supporting facts have no probative value") (quotations omitted).

[13] Plaintiff attempts to dispute this by pointing to the Declaration of Rick Amering, the Senior Manager for Human Resources at Paychex. PSOF ¶ 51. But his Declaration states only that they interviewed Ms. Tate. Decl. of Rick Amering [ECF No. 93-7] ¶ 4.

not enough . . . to 'simply argue or even show that [s]he was better qualified than the person who received the position [s]he coveted.'" *Sprowl v. Mercedes-Benz U.S. Int'l, Inc.*, 815 F. App'x 473, 480 (11th Cir. 2020) (quoting *Springer*, 509 F.3d at 1349) (alterations omitted).  Rather, Plaintiff "must show that the disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quotations and citation omitted).  This she cannot do, because she *herself* testified that the role she sought and Tate received "was [Tate's] role or a role similar to hers that [Tate] had in the organization [i.e., Oasis] prior at a much smaller level."  Calicchio Dep. at 142:21-143:3.

Finally, even if Plaintiff could show that her raising the gender pay issue with Mr. Perlberg caused him to not recommend her to Paychex, she has nevertheless failed to establish that this was the but-for cause of Paychex's failure to consider her for the position.  At this stage of the inquiry, "but-for" causation requires "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Glover v. Dist. of Trustees of Palm Beach St. Coll.*, No. 19-80968, 2020 WL 3118469, at *3 (S.D. Fla. Jan. 23, 2020) (quoting *Nassar*, 570 U.S. at 360).  But Ms. Zaucha testified, and Plaintiff did not rebut, that Paychex's understanding of Plaintiff's business experience, and thus her fitness for the role she sought, came *both* from Ms. Zaucha's own understanding of Plaintiff's resume along with Mr. Perlberg's opinion.  Zaucha Dep. at 35:11-36:6.  This is significant because Plaintiff introduced no evidence whatsoever of any retaliatory intent on the part of Ms. Zaucha or any other Paychex employee.  Thus, Plaintiff has not shown a genuine dispute that but for Mr. Perlberg's failure to recommend her, she would have been considered for the position.

"A reason cannot be a pretext for discrimination [or retaliation] unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted). "Because the plaintiff carries this burden, [s]he must produce significant probative evidence of pretext." *Castillo v. Roche Laboratories, Inc.*, 467 F. App'x 859, 863 (11th Cir. 2012) (citing *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). "Plaintiff must therefore point to *specific, concrete* facts which support her assertion that any reason for Defendants' legitimate, non-retaliatory actions were pretextual." *Seldon*, 653 F. Supp. 2d at 1380 (emphasis added).

Plaintiff has produced no specific, concrete evidence to create an issue of fact as to *both* questions at hand: (1) whether Defendants' failure to consider her for the role she sought was because they viewed the position as an operations role and viewed her as having experience limited to human resources; and (2) whether the real reason she was not considered was because Defendants sought to retaliate against her for complaining about potential gender pay discrimination at Oasis. Accordingly, summary judgment is warranted as to the retaliation claims under Title VII in Counts X and XII of the Second Amended Complaint.[14]

---

[14] Plaintiff insists that she also asserted retaliation claims under the EPA and thus believes that the Report "errs in limiting the retaliation claims to Title VII." Pl.'s Objs. at 20. However, the Court need not decide this question because the facts giving rise to the EPA retaliation claims are the same as those underlying the Title VII retaliation claims, and the legal analysis is the same. *Ralston v. Bell Aerospace Servs.*, No. 1:09cv379, 2010 WL 2403084, at *8 (M.D. Ala. June 14, 2010) ("Retaliation claims under Title VII and the Equal Pay Act require the same elements."); *Seldon*, 653 F. Supp. 2d at 1376 ("Since the facts giving rise to Plaintiff's retaliation claims are identical and the legal analysis is the same under Title VII, § 1981, and the EPA, the Court addresses these claims collectively.") (citing *Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1369 n.5 (M.D. Ga. 2002)). Therefore, assuming that Plaintiff properly asserted claims for retaliation under the EPA, "[s]ummary judgment will be granted on [Plaintiff's] retaliation claim based on the Equal Pay Act for the same reasons that it will be granted on her retaliation claim based on Title VII." *Ralston*, 2010 WL 2403084 at *8 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).

<u>**CONCLUSION**</u>

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Due to the voluminous briefing submitted by the parties and considered by the Court, a hearing on the Report is unnecessary.  Thus, Plaintiff's Unopposed Request for Oral Argument Regarding Objections to Report and Recommendation [ECF No. 133] is **DENIED**.

2.  The Report [ECF No. 125] is **AFFIRMED AND ADOPTED in part** as supplemented herein.

3.  Defendants' Motion to Strike the Declaration of Vilma Petrovsky [ECF No. 113] and Defendants' Motion for Summary Judgment [ECF No. 97] are **GRANTED**.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 22nd day of July, 2021.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:     Counsel of record

Magistrate Judge Bruce E. Reinhart